**SOUTHERN UTAH WILDERNESS ALLIANCE, et al., Plaintiffs,**

v.

**Gail NORTON, Secretary, U.S. Department of Interior, et al. Defendants.**

**No. CIV.A.04–666 EGS.**

United States District Court, District of Columbia.

July 21, 2004.

Sharon Buccino, Natural Resources Defense Council, Washington, DC, Stephen

H.M. Bloch, Southern Utah Wilderness Alliance, Salt Lake City, UT, for Plaintiffs.

Barry Alan Weiner, U.S. Department Of Justice, Washington, DC, for Defendants.

Bret A. Sumner, L. Poe Leggette, Fulbright & Jaworski, L.L.P, Washington, DC, J. Mark Ward, Salt Lake City, UT, for Intervenor Defendants.

### MEMORANDUM OPINION

SULLIVAN, District Judge.

## I. INTRODUCTION

Plaintiffs, the Southern Utah Wilderness Alliance, the Natural Resources Defense Council, the Wilderness Society, the Sierra Club, and the Utah Rock Art Association (collectively "SUWA"), challenge the Department of Interior's and the Bureau of Land Management's ("BLM") administrative decision, codified in an Environmental Assessment ("EA"), Finding of No Significant Impact ("FONSI"), and Decision Record ("DR"), to authorize the Stone Cabin 3D Seismic Survey Project ("Stone Cabin Project" or "Project"). Plaintiffs argue that BLM's approval of the Project, which permits seismic oil and natural gas exploration of approximately 57,500 acres of public and private lands in eastern Utah, violates the Administrative Procedure Act's ("APA") prohibition against agency decision-making that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2003); see also Finding of No Significant Impact and Decision Record ("FONSI/DR"), Administrative Record 13 ("AR") (describing lands affected by the Project). Specifically, plaintiffs aver that the BLM's approval of the Project runs afoul of the National Historic Preservation Act ("NHPA"), the National Environmental Policy Act ("NEPA"), and the Federal Land Policy and Management Act ("FLPMA").

Pending before the Court are cross motions for summary judgment. Plaintiffs seek a declaratory judgment that the BLM's approval of the Stone Cabin Seismic Project is unlawful, and ask the Court to vacate and remand the BLM's decision. Federal Defendant BLM cross-moved for summary judgment, and the motion was joined by Intervenor Bill Barrett Corporation ("BBC"),[1] and Intervenors the Utah Division of Oil, Gas and Mining, the Utah School and Institutional Trust Lands Administration, and Carbon County, Utah (collectively "Utah Intervenors").

Upon careful consideration of the motions, the responses and replies thereto, the oral arguments of counsel, the entire record herein, as well as the governing statutory and case law, and for the following reasons, it is by the Court hereby **ORDERED** that the plaintiffs' motion for summary judgment is **DENIED**; and it is **FURTHER ORDERED** that defendants'/intervenors' motion for summary judgment is **GRANTED**.

### A. Factual Background

The Stone Cabin Project proposes to "image surface geologic formations and conditions to aid in determining the possible presence of oil and natural gas resources." FONSI/DR, AR 13. Detection of these resources is accomplished via "seismic reflection methods," which involve "the generation of ground vibrations or seismic waves, and the recording of seismic waves at source points and receiver points that would be located throughout the project area, respectively." Id. The data produced allows geophysicists to evaluate the "potential presence or absence of

1. BLM's approval of the Project authorizes Bill Barrett Corporation, through its contrac-

tor Dawson Geophysical Company, to conduct seismic surveys on the land at issue.

formations and structures which could contain natural gas or oil." *Id.* Two main methods are used to generate seismic waves: (1) the "drilling of holes (shot holes) ... and the detonation of explosives (shots) placed in the shot holes," and (2) mechanical techniques referred to as vibroseis. FONSI/DR, AR 13–14. Where shot holes are used, "buggy drills" and "heliportable drills" will drill holes to a depth of approximately 50 feet; the detonation of explosives placed in the bottom of the holes will generate ground vibrations recordable by geophysicists. Where vibroseis is used, vibrator buggies, working in pairs and each weighing about 62,000 pounds, will vibrate the ground at designated source points for time periods of "a few seconds to several minutes;" again, the sound waves reflecting from underground rock formations will generate recordable data used to locate gas and oil resources. *See* Bill Barrett Corporation Stone Cabin 3D Seismic Survey Project Environmental Assessment ("EA"), AR 112, AR 130; FONSI/DR, AR 13. Within a single source point, the buggies may vibrate at up to ten stops, each four feet apart, and then proceed to the next source point. EA, AR 112.

The Project engendered the instant controversy largely due to its location; the core of plaintiffs' claim is that the vibrations produced by the exploration methods could damage or destroy cultural resources, such as "rock art" and pit houses erected by ancient cultures, located within the project area. Compl. ¶ 2. The project

area encompasses approximately 57,500 acres of land in northeastern Carbon County, Utah; while oil and gas development activity is not new to the area, and indeed "has been ongoing in much of the project area since the 1950's," the area is rich with significant cultural and archaeological resources. FONSI/DR, AR 13. The project area includes 5,300 acres of the Nine Mile Canyon Special Recreation and Cultural Management Area ("SRCMA"), an administratively designated area designed to protect and preserve prehistoric and historic resources; portions of the 78–mile Nine Mile Canyon National Backcountry Byway; and the proposed Nine Mile Canyon Archaeological District, which is eligible for listing on the National Register of Historic Places. *See* FONSI/DR, AR 16, AR 37. Over 1000 cultural, historic, and archaeological sites have been recorded in the SRCMA, seventy-five to eighty percent of which are "rock art that range from representations of individual figures to multiple components and panels composed of numerous figures." *Id.*, AR 15. Prehistoric remains such as "cliff dwellings, masonry granaries, slab storage cists, semi-subterranean pit houses, [and] retaining walls" are also present in the area. *Id.*, AR 15–16. Accordingly, the "principal management objective for the SRCMA is to protect and preserve [these] prehistoric and historic resources." *Id.*, AR 16. The project area also includes parts of two BLM established wilderness study areas ("WSAs"), the Jack Canyon and Desolation Canyon WSAs.[2]

---

**2.** The Federal Land Policy and Management Act requires the Secretary of the Department of Interior to "prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values (including, but not limited to, outdoor recreation and scenic values), giving priority to areas of critical environmental concern." 43 U.S.C. § 1711(a). Section 603 of FLPMA ordered the Secretary to review certain "roadless areas of five thousand acres or more" and report to the President recommendations concerning the "suitability or nonsuitability" of each area for preservation as wilderness. *See* 43 U.S.C. § 1782(a). These areas under wilderness review are called Wilderness Study Areas ("WSAs"), and such lands must be managed so as "not to impair the suitabili-

*Id.,* AR 16. Approximately eighty five percent of the Jack Canyon WSA is located within the project area. *Id.*

## B. Procedural Background

On May 29, 2002, the Dawson Geophysical Company filed with the BLM a Notice of Intent to Conduct Oil and Gas Exploration Operations on behalf of Bill Barrett Corporation ("BBC"). In September of 2003, the BLM published the Stone Cabin 3D Seismic Survey Project, Environmental Assessment ("EA"). The BLM allowed 30 days of public comment on the EA, receiving over 24,000 public comments. Three alternatives were considered in the preparation of the EA, including a no-action alternative; the Agency's preferred alternative, Alternative B, was ultimately selected. BLM issued a FONSI and Decision Record on March 19, 2004, concluding on the basis of the EA that an Environmental Impact Statement ("EIS") was not required. The DR adopted the agency's preferred alternative, and authorized Dawson Geophysical Company to commence surface disturbing activities as soon as it secured permits and obtained a Notice to Proceed from BLM.

On April 30, 2004, plaintiffs moved for a preliminary injunction to prevent the commencement of the seismic exploration. After full briefing by all parties and a hearing on the preliminary injunction motion, the parties reached an agreement. Plaintiffs then withdrew their motion for injunctive relief, and the parties proceeded to summary judgment. *See* May 25, 2004, Order.

## II. *STANDARD OF REVIEW*

### A. Summary Judgment

This case is before the Court on the parties' cross motions for summary judg-

ment. Pursuant to Federal Rule of Civil Procedure 56, summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Likewise, in ruling on cross-motions for summary judgment, the court may grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. *See Rhoads v. McFerran,* 517 F.2d 66, 67 (2d Cir.1975). This Circuit has repeatedly recognized that summary judgment is an appropriate procedure when a court reviews an agency's administrative record. *See, e.g., Bloch v. Powell,* 227 F.Supp.2d 25, 30–31 (D.D.C.2002)(citing *Fund for Animals v. Babbitt,* 903 F.Supp. 96, 105 (D.D.C.1995)).

### B. Administrative Review

On a review of agency action pursuant to the Administrative Procedure Act ("APA"), the Court must determine whether the challenged decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In reviewing an agency's action, the court must engage in a "thorough, probing, in-depth review" to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). However, while the Court's inquiry must be "searching and careful," the standard of review is also a highly deferential one; the agency's actions are "entitled to a pre-

ty of such areas for preservation as wilderness." 43 U.S.C. § 1782(c).

sumption of regularity," and the court cannot "substitute its judgment for that of the agency." *Id.* at 415–16, 91 S.Ct. 814.

## III. *ANALYSIS*

Plaintiffs allege that the BLM's Finding of No Significant Impact ("FONSI") and Decision Record ("DR") authorizing the Stone Cabin Seismic Project violate the National Historic Preservation Act ("NHPA"), the National Environmental Policy Act ("NEPA") and the Federal Land Policy and Management Act ("FLPMA"). Each claim is discussed in turn.

### A. National Historic Preservation Act (NHPA) Claims

Plaintiffs argue that the BLM failed to identify historic properties potentially present in the project area prior to approving the Project, failed to consider the Project's adverse effects on historic properties, and failed to respond to the discovery of additional historic properties after the NHPA process concluded. Pls.' Mot. for Summ. J. at 7. BLM counters that it satisfied its NHPA obligations "to identify cultural resources in the Project area and has undertaken significant protective measures as part of this Project to ensure that no cultural resources, including rock art on canyon walls and standing structures, will be adversely impacted by this Project." Defs.' Mot. for Summ. J. at 4.

*1. The National Historic Preservation Act*

Congress enacted the NHPA in 1966 recognizing that "historic properties significant to the Nation's heritage are being lost or substantially altered, often inadvertently, with increasing frequency" and that "the preservation of this irreplaceable heritage is in the public interest so that its vital legacy of cultural, educational, aesthetic, inspirational, economic, and energy

benefits will be maintained and enriched for future generations of Americans . . . ." 16 U.S.C. § 470(b)(3),(b)(4). Pursuant to the NHPA, federal agencies "having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license . . . take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register." 16 U.S.C. § 470f. Accompanying regulations require that an agency engage in consultation with

> the agency official and other parties with an interest in the effects of the undertaking on historic properties, commencing at the early stages of project planning. The goal of consultation is to identify historic properties potentially affected by the undertaking, assess its effects and seek ways to avoid, minimize or mitigate any adverse effects on historic properties.

36 C.F.R. § 800.1(a). Participants in this process include the agency official, the Advisory Council on Historic Preservation ("Council"), the State Historic Preservation Officer ("SHPO"), representatives from Indian tribes, representatives of local governments, and applicants for licenses. 36 C.F.R. § 800.2(c). Additional parties with a "demonstrated interest in the undertaking" may also participate. 36 C.F.R. § 800.2(c)(5).

Pursuant to the NHPA, the agency must "make a reasonable and good faith effort" to identify historic properties potentially affected by a proposed project, looking to both existing information as well as seeking new information from consulting parties in that identification effort. 36 C.F.R. § 800.4(b)(1). The agency must then assess the likelihood of adverse effects on identified historic properties; "an adverse

effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register." 36 C.F.R. § 800.5(a)(1). Such adverse effects may include "reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative." 36 C.F.R. § 800.5(a)(1). If an agency determines that the proposed project will not adversely affect historic properties, it must submit a finding of no adverse effects, with supporting documentation, to all consulting parties. 36 C.F.R. § 800.5(b). The State Historic Preservation Officer ("SHPO") then has 30 days to review the agency determination; the agency may proceed with the project if the SHPO agrees with the agency's finding of no adverse effect. 36 C.F.R. § 800.5(c)(1); 36 C.F.R. § 800.4(d)(1). However, if the SHPO or a consulting party disagrees within the 30 day period, the agency official must "consult with the party to resolve the disagreement, or request the Council to review the finding." 36 C.F.R. § 800.5(c)(2)(i). When a finding is submitted for the Council's review, the Council must determine "whether the adverse criteria have been correctly applied ... [and] specify the basis for its determination. The agency official shall then proceed in accordance with the Council's determination." 36 C.F.R. § 800.5(c)(3). If the Council makes a finding of no adverse effect, implementation of the proposed undertaking is permitted; if an adverse effect is found, NHPA mandates that the agency official "consult further to resolve the adverse effect pursuant

to § 800.6." 36 C.F.R. §§ 800.5(d)(1) and (2).

*2. BLM's Identification Efforts*

BLM conducted both Class I and Class III surveys in the project area in an effort to identify historic properties.[3] EA, AR 182–187. The Class I searches located 59 past archaeological surveys that were conducted in or near the project area; these surveys revealed 63 historic sites in the project area. Letter from BLM to Utah State Historic Preservation Office of 7/22/03, AR 752. BLM then conducted Class III cultural surveys, using a 100 foot wide survey parameter, which discovered 48 newly recorded cultural sites, of which 16 may be eligible for inclusion on the National Register of Historic Places ("NRHP"). *Id.* Based on these surveys, and consistent with NHPA modification and mitigation requirements, the BLM

> decided to treat the previously identified 63 sites and the newly identified 48 sites as eligible for the NRHP, and to avoid all of these sites during project activities. Specifically, in the event a site was located within the 100–foot wide inventory corridor or in an access route or staging area, the site would be flagged and the source point, route, or staging area would be relocated. In the event a site was located within 300 feet of a vibrator buggy source point, the source point would be bypassed and the buggy would move on the next source point on the existing road.

Defs.' Opp. to Mot. For Prelim. Inj. at 8; *see also* Letter from BLM Field Office to Utah SHPO of 7/22/03 (initiating NHPA consultation).[4] Essentially, the BLM sur-

---

**3.** Class I surveys review previously conducted cultural resource surveys or inventories. Class III surveys are new, on the ground surveys used to identify historic properties and those properties that may be eligible for

inclusion on the National Register of Historic Places.

**4.** Defendants relied on and incorporated their Opposition to the Motion for Preliminary In-

veyed a 100 foot area around each proposed source point for the presence of cultural resources; if any resources were found in that area, the source point was moved. The BLM and BBC also determined that any discovered resources will be avoided by 200 to 300 foot setback areas. Additionally, as a condition of Project approval, BLM required that an environmental compliance monitor ("ECM"), a certified archaeological monitor, and a ground motion compliance monitor be on the ground during the exploration activities to ensure that cultural resources are protected. FONSI/DR, AR 20–21. Based on these surveys, and the mitigation measures put in palce to avoid and protect known cultural resources, the BLM made a finding that the Project would have no adverse effect on historic properties, and submitted this finding to the Utah SHPO with a request for concurrence. Letter from BLM to Utah SHPO of 7/22/03, AR 220. The Utah SHPO and the Advisory Council both concurred with the finding of no adverse effect. *See* Letter from Utah SHPO to BLM of 7/22/03, AR 755–56; Letter from Advisory Council to BLM Field Office of 2/17/04, AR 792.

Following this initial approval, BLM determined that additional surveys were needed in areas of the Jack Canyon. Letter from BBC to BLM Field Office of 4/28/04, AR 1951. BBC agreed to conduct additional 400 foot surveys in areas of the Jack Canyon where heliportable shot holes will be used, and agreed to conduct broader cultural resource surveys for any shot point located within 200 to 300 feet of a defined canyon rim. *Id.;* Letter from BLM Field Office to Advisory Council of 5/20/04. BLM informed the SHPO and the Advisory Council of these additional surveys, and the Advisory Council concurred with BLM's action. Letter from

Advisory Council to BLM Field Office of 5/20/04 (stating that the additional survey requirements "should suffice to protect historic properties during implementation of the project").

### 3. BLM Adequately Identified Historic Properties and Adverse Effects

The core of plaintiffs' argument is that the vibrations generated from the exploration activities could harm or destroy significant cultural resources in the project area, as the BLM has not, they aver, conducted a survey of the area that adequately identifies resources, such as rock art, potentially at risk of harm from the vibrations. In plaintiffs' view, defendants failed to utilize an appropriate "area of potential effects" when identifying cultural resources potentially affected by the project—essentially, that defendants did not survey a large enough area around each source point— thereby making it impossible to identify historic properties pursuant to NHPA identification obligations. *See* 36 C.F.R. § 800.16(d)(defining area of potential effects as "the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties"). Plaintiffs aver that BLM arbitrarily limited the cultural resource identification area to a 100 foot diameter corridor around each source point, and that the identification efforts should have been expanded to a 300 foot diameter area to ensure that cultural resources potentially located outside of the 100 foot diameter are protected from potentially harmful vibrations. Pls.' Mot. for Summ. J. at 7–8.

▇ Thus, the central issue before the Court is whether the BLM's identification efforts were adequate; namely, whether it was necessary to expand the 100 foot area surveyed to a 300 foot diameter area in

junction in their Motion for Summary Judg- ment. *See* Defs.' Mot. for Summ. J. at 2.

order to properly identify resources at risk of harm from the vibrations. An affirmative answer to this question would signal a NHPA violation, as the BLM has an obligation to identify historic properties potentially affected by a proposed project. 36 C.F.R. §§ 800.4(a), (b)(1). The question is two-fold: (1) whether there are undiscovered resources in the project area; and (2) if the area does indeed house cultural resources that were not identified by BLM's surveys, whether vibrations from the imaging techniques will reach such a level that the resources may be harmed.

Plaintiffs focus heavily on the first prong of this question, arguing strenuously that the 100 foot surveys were inadequate to locate resources potentially located in the project area. Central to plaintiffs' argument is Dr. James Allison's research; Dr. Allison is an anthropologist who, at the request of plaintiffs, conducted a reconnaissance survey in the Jack Canyon area during April 2004. Dr. Allison's research documented four previously unrecorded cultural sites within 50 to 300 feet of proposed source points. *See* Jack Canyon Reconnaissance Survey at 2. Dr. Allison's discoveries, plaintiffs argue, prove that resources exist within an area potentially affected by the seismic activities, and within an area that BLM should have surveyed.

The fatal flaw in plaintiffs' analysis, however, is their failure to reach the second part of the question; that is, even assuming *arguendo* that there are resources located outside of the 100 foot survey area, and within plaintiffs' suggested 300 foot survey area, the question remains whether these resources could in fact be *harmed* by the vibrations. BLM persuasively argues that it is the answer to this second question that in fact led the agency to establish the 100 foot diameter survey area. Specif-

ically, BLM states that the decision to survey a 100 foot area was directly based on estimates of how far, and at what levels, vibrations from the seismic activities could travel. The BLM has previously established "a threshold of .75 inches per second as the maximum acceptable particle velocity to be induced at rock art panels or standing structures;" in other words, BLM has concluded that vibration levels become dangerous to cultural resources when they reach a level of .75 inches per second.[5] Stone Cabin Seismic EA Content/Comment Analysis Responses; AR 36.

However, the record evidence indicates that vibrations from the Stone Cabin Project's vibroseis activities are only expected to reach .35 inches per second at a distance of 50 feet from the source point, and vibrations from heliportable drilling are "barely noticeable by humans 50 feet from the source point." Stone Cabin Seismic EA Content/Comment Analysis Responses, AR 36; AR 25; *see also* Colin Matheson Decl. ¶ 15 (explaining that vibroseis vehicles would only generate ground vibrations in the range of .20 to .70 inches per second, and that the .70 estimate is a "worst case scenario"). This level of vibration is well below the BLM established threshold of .75 inches per second; accordingly, the BLM concluded that a cultural resource inventory search beyond the 50 foot radius area was unnecessary. *See* FONSI/DR, AR 25; *see also* Stone Cabin Seismic EA Content/Comment Analysis Responses, AR 36 ("In other words, there is no potential for impact to cultural resources located more than 50 feet from the source point.").

Plaintiffs attempt to discredit BLM's premise that vibrations will not exceed .35 inches per second, countering that the .75 inches per second threshold may well be

5. Plaintiffs have not challenged the validity of the .75 inches per second threshold.

exceeded in areas beyond 50 feet from source points. They attack BLM's conclusion that vibrations will stay at a "safe" level, arguing that the only support BLM offered is the conclusion reached by the 1988 Vibra–Tech study. *See* EA, AR 138 (citing Vibra–Tech Engineers Incorporated Study for the proposition that "vibrator buggy operations would generate ground vibrations such that at a distance of 50 feet from the buggy, the maximum particle velocity would not exceed .35 inches per second . . ."). However, while arguing vehemently that BLM should not have relied on the Vibra–Tech study, plaintiffs fail to point to a single alternative study on which BLM could or should have relied. Indeed, during the Summary Judgment Motions Hearing, plaintiffs conceded they were unable to point to another, more appropriate study:

> The Court: You argue that the BLM should not have relied on the Vibra–Tech study. But the record is clear, unless I'm mistaken, that you've not pointed to any other study that the government should have relied on, is that correct?
>
> Plaintiffs' Counsel: That is correct, Your Honor.
>
> The Court: Is there any other study that would demonstrate that reliance on

the Vibra–Tech study is just plain wrong? And I assume your answer is no?

> Plaintiffs' Counsel: Yes, that's correct, the answer is no.

Tr., 6/28/04 Motions Hearing at 23. Moreover, BLM's decision to survey a 100 foot diameter area was not solely based on the Vibra–Tech study; the decision also fully complied with the BLM's Geophysical Handbook[6] guidelines for identifying historic properties in the project area. *See* Pls.' Ex. 3, Cultural Resource Procedures for Geophysical Operations, BLM Handbook 3150. The Geophysical Handbook specifically states that

> where a class III survey has been determined necessary, it will cover 50 feet on either side of center line or at least 25 feet beyond the limits of anticipated vehicular activities/surface disturbance created by projects that affect more than a 100 foot wide survey area. *A minimum of a 100 foot wide survey is required.*

Cultural Resource Procedures for Geophysical Operations, BLM Handbook 3150, Illustration 9 (emphasis added).[7]

■ Central to the Court's review of the BLM's decision-making process is the recognition that the agency, not the Court, is "entrusted with the responsibility of con-

---

**6.** The Geophysical Handbook is the U.S. Department of Interior Handbook on Onshore Oil and Gas Geophysical Exploration Surface Management Requirements.

**7.** Plaintiffs rely on Illustration 10 in the Geophysical Handbook, which recommends that heliportable drilled source points be located 199 feet from known cultural resources, buggy-drilled source points be located 280 feet from known cultural resources, and vibroseis source points be located 300 feet from known cultural resources. However, defendants persuasively argue that plaintiffs' reliance on Geophysical Handbook Illustration 10 is misplaced; while Illustration 10 governs set back protection zones for *known* resources, Illus-

tration 9, allowing a 100 foot survey area, governs the dimensions of the Class III surveys undertaken here. *Compare* Cultural Resource Procedures for Geophysical Operations, BLM Handbook 3150, Illustration 9 *with* Resource Protection Offsets for Cultural Resource Structures and Other Facilities, BLM Handbook 3150, Illustration 10. Accordingly, the Court is convinced that BLM conducted a proper inventory search pursuant to Illustration 9. Moreover, the Court notes that BLM has adopted the recommended 200–300 foot setbacks for known cultural resources pursuant to Illustration 10. *See* FONSI/DR, AR 25.

sidering the various modes of scientific evaluation and theory and choosing the one appropriate for the given circumstances." *Sierra Club v. U.S. Dept. of Transp.,* 753 F.2d 120, 129 (D.C.Cir.1985). Here, the BLM chose to rely on an existing scientific study, and that decision warrants deference. Plaintiffs' disagreement with the Vibra–Tech study, without pointing to serious flaws in the study, does not establish that the agency's reliance was arbitrary. Indeed, even if plaintiffs were able to point to another study providing contrary information-which they have not done-the agency still has discretion to rely on its chosen experts or research. "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Fund for Animals v. Williams,* 246 F.Supp.2d 27, 46 (D.D.C.2003) (quoting *Sierra Club v. Watkins,* 808 F.Supp. 852, 862 (D.D.C.1991)). The BLM has provided sufficient evidence to establish that vibration levels will not exceed .75 inches per second beyond the 50 foot area; plaintiffs cannot cry foul without providing the Court with evidence that the BLM's conclusion is scientifically unsound.

Finally, even though it appears to the Court that these measures were fully adequate to ensure that cultural resources would be protected from potentially dangerous vibroseis vibrations, BLM also established, and BBC committed to, an on the ground Monitoring Protocol. *See* Special Conditions–Geophysical Exploration, AR 229; Environmental Compliance and Post–Project Monitoring Plan, AR 287–297. Specifically, three independent monitors—an environmental compliance monitor, an archaeological monitor, and a ground motion compliance monitor—will be on the ground to ensure that cultural resources are protected, and that vibroseis vibrations stay below the .75 inches per second threshold at 50 feet on either side of the source point. *See* EA, AR 128, AR 287–97. BBC also committed to performing pre-Project tests of the vibroseis vehicles to ensure that vibrations do not exceed the 0.75 inches per second threshold at a distance of 50 feet from the equipment. EA, AR 291.

These pre-Project tests, coupled with the presence of the on the ground monitors, quell the Court's fears that vibrations from vibroseis vehicles will exceed the .75 inches per second threshold. Indeed, plaintiffs essentially conceded this point during oral argument.

> The Court: Don't those pre-project on the ground measures, coupled with on the ground monitors, quell any fears that vibrations will reach dangerous levels?
>
> Plaintiffs' Counsel: [Y]es, as to the vibrator buggies, the vibroseis testing.

*See* Tr. at 25–26.

Moreover, any concerns related to the use of shot hole exploration methods, if not addressed during the original decision making process as codified in the EA, FONSI, and Decision Record, have been thoroughly addressed during pre-work conferences between BLM and BBC.[8] First, BLM required BBC to change a number of vibroseis drilled source points to heliportable drilled shotholes in areas of Jack Canyon. FONSI/DR, AR 14–15. The DR states, and plaintiffs have not controverted, that "detonation of charges in the shot holes produces vibrations that are exceeded in nature ... [they] are barely noticeable by humans 50 feet from

---

8. These pre-work conferences were specifically made conditions of Project approval. *See*

Special Conditions–Geophysical Exploration, AR 229.

the source point. There is no vibration threat to the types of sites known to occur or expected to occur on the plateau." FONSI/DR, AR 25 (noting low vibrations from detonation in shot holes); EA, AR 138 (noting that heliportable drilled source points, to be used in the WSAs, generate lower vibrations). Nonetheless, BLM still required BBC to conduct additional 400–foot wide cultural surveys in areas outside the plateaus, specifically along the portions of Jack Canyon where heliportable shot points will be used. Letter from BBC to BLM Field Office of 4/28/04, AR 1951 (BBC committing to additional surveys). BBC also committed to conducting "a broader cultural resource survey for any shot point located within 200 to 300 feet of a defined canyon rim. A 200 foot survey radius will be used in the case of a heliportable shothole, and a 300 foot radius will be surveyed for buggy-drilled shotholes." Letter from BBC to BLM Field Office of 4/28/04, AR 1951 (stating it has "become apparent that compliance with requirements for setbacks from sensitive cultural features as required by the Decision Record may not be accomplished using existing cultural survey data alone"). BLM informed the Advisory Council of these additional requirements, and the Advisory Council again concurred with Pro-

ject commencement. *See* Letter from Advisory Council to BLM Field Office of 5/20/04 ("Our concerns are adequately addressed by the commitments expressed in your [the BLM] letter. Completion of additional inventory proposed, and avoidance of all vibration sensitive archaeological sites by a margin of 200 feet for heliportable shot holes and 300 feet for buggy drilled shot holes should suffice to protect historic properties during implementation of the project.").[9]

Finally, and perhaps most significantly, the BLM has not made a finding of adverse effect, and the Advisory Council and Utah SHPO—even when informed of Dr. Allison's findings—both concurred with the BLM's finding of no adverse effect on historic properties in the project area. The agency has therefore fulfilled its obligations, for "if the SHPO/THPO, or the Council if it is has entered the section 106 process, does not object within 30 days of receipt of an adequately documented finding, the agency's responsibilities under section 106 are fulfilled." 36 C.F.R. § 800.4(d)(1); 36 C.F.R. § 800.5(c)(1). Thus, given that BLM conducted Class I and Class III surveys, established 300 foot protection zones for known cultural resources, established an on the ground

---

9. Plaintiffs counter that these additional measures "do not cure BLM's failure to identify affected cultural resources prior to issuing its Decision Record" and argue that such "phased identification" is not permissible in the absence of a Memorandum of Agreement. Pls.' Mot. for Summ. J. at 9–10; *see* 36 C.F.R. § 800.4(b)(2) (providing for phased identification in certain circumstances). However, these arguments fall flat, as BLM makes clear that it is *not* attempting a phased identification process, because BLM had already completed cultural resource surveys for the *entire* area, and received concurrence in its finding of no adverse effect from both the Council and SHPO. Moreover, the EA specifically contemplated that, as the result of pre-work conferences, the BLM could require BBC to un-

dertake additional protective measures. BLM did indeed require additional surveys, and BBC agreed to conduct them. *See* Letter from BLM to Advisory Council of 5/20/04 (noting that the additional protective measures are "consistent with the analysis in the EA, the terms and conditions of the Decision Record, Notice of Intent and all applicable Special Conditions and mitigation measures"); Letter from Advisory Council to BLM of 5/20/04 (concurring that Project can proceed); Tr. at 62–63; *see also* Stone Cabin 3D Seismic Survey Project Environmental Compliance and Post–Project Monitoring Plan, AR 287–298 (setting forth procedures to facilitate environmental compliance). BLM and BBC cannot be faulted for their continued effort to protect cultural resources.

monitoring plan, required pre-Project tests of vibroseis vehicles, agreed to conduct additional surveys in the Canyon area, and obtained the continued approval of both the Utah SHPO and the Advisory Council, the Court is satisfied that the agency has fulfilled its NHPA obligation to "make a reasonable and good faith effort" to identify historic properties potentially affected by the Stone Cabin Project. 36 C.F.R. § 800.4(a).[10]

### 3. BLM Does Not Have a Duty to Reopen the Consultation Process

Plaintiffs finally argue that BLM, in declining to re-open the Section 106 consultation process, violated 36 C.F.R. § 800.13(b)(1). Plaintiffs aver that Dr. James Allison's report revealing previously unidentified cultural resources, as well as the National Trust for Historic Preservation's formal request to reopen the Section 106 review, triggered BLM's obligation to "consult to resolve adverse effects pursuant to § 800.6." 36 C.F.R. § 800.13(b)(1); see also Letter from National Trust for Historic Preservation to BLM, the Advisory Council and the Utah SHPO of 4/19/04 (describing Dr. Allison's findings). BLM argues that there is no such duty, as once "the SHPO and Advisory Council agree with the agency's finding, the agency's section 106 consultation obligations under the NHPA are completed and the proposed project may proceed." See 36 C.F.R. § 800.4(d)(1). BLM concludes that because it did receive such a concurrence, and no adverse effect has ever been found, it is under no obligation to consult further.

The Court is persuaded by defendants' plain language reading of the NHPA regulations. Section 800.4(d) details two procedures: Section 800.4(d)(1) sets forth the procedure to be followed if the agency finds that no historical properties are affected, and Section 800.4(d)(2) sets forth the procedures to be followed if the agency finds that there are historic properties which may be affected. When the agency finds, pursuant to Section 800.4(d)(2), that there are historic properties which may be affected, Section 800.5 is triggered. Section 800.5 provides for the assessment of adverse effects, and sets forth a detailed consultation process. However, if the agency finds no adverse effect, and the SHPO and Council agree with this determination, Section 800.4(d)(1) makes clear that "that the agency official's responsibilities under section 106 are fulfilled." See 36 C.F.R. § 800.4(d)(1). Thus, it appears when, as here, the SHPO does not dispute the finding of no adverse effect, Section 800.5 duties are not triggered.

Likewise, Section 800.13(b) requires that the agency "consult to resolve adverse effects pursuant to § 800.6." 36 C.F.R. § 800.13(b). While the section does state that the new discovery of historic properties requires the agency official to "make reasonable efforts to avoid, minimize or mitigate adverse effects to such properties," Section 800.13(b) only requires consultation to "resolve adverse effects." Id. Here, although notified that new properties were discovered, neither the SHPO nor the Council made a finding that the proposed project may have an adverse ef-

---

10. Plaintiffs' argument that BLM failed to analyze the Project's adverse effects on historic properties flows from their argument that BLM failed to identify historic properties. Plaintiffs argue, "The agency did not—and cannot—analyze what it did not know about. BLM could not make a full and thorough analysis of the project's adverse effects be-

cause the agency used an inadequate, arbitrary inventory of historic and cultural properties." Pls.' Mot. for Prelim. Inj. at 19. Because the Court finds the scope of the identification effort was adequate, the tangential argument that adverse effects were not studied because of a faulty identification procedure also fails.

fect on cultural resources, largely because the mitigation measures, as well as the additional surveys recently undertaken by BBC, demonstrate that adverse effects are not likely.

Indeed, even after the Advisory Council received the National Trust's letter detailing Dr. Allison's findings and seeking to reopen consultation, the Council *still* concurred with the Project going forward. The Council did not seek to reopen the NHPA process, nor did it make a finding of adverse effects. Rather, the Council's response to the new information revealed by Dr. Allison's research states

> Our concerns are adequately addressed by the commitments expressed in your [the BLM] letter. Completion of additional inventory proposed, and avoidance of all vibration sensitive archaeological sites by a margin of 200 feet for heliportable shot holes and 300 feet for buggy drilled shot holes should suffice to protect historic properties.

Letter from Advisory Council to BLM Field Office of 5/20/04. This correspondence makes clear that the Council is not seeking to reopen the consultation process, and indeed still concurs with the agency's finding of no adverse impact.

The Court, in its deferential review of agency action, places great weight on the fact that the instant agency action received the approval of the very entities charged with overseeing compliance with NHPA. Accordingly, given this continued concurrence, and absent a finding of adverse effects, the Court finds that BLM has no duty to re-open the consultation process.

**B. National Environmental Policy Act**

The National Environmental Policy Act ("NEPA") requires that, before an agency takes action that "significantly affects" the environment, the agency prepare an Environmental Impact Statement ("EIS") evaluating the impacts of the action, as well as identifying and evaluating alternatives to the proposed action. 42 U.S.C. § 4332(c). In order to determine whether a proposed action is likely to significantly affect the environment, thus triggering the need for an EIS, the agency may first prepare an Environmental Assessment ("EA"). 40 C.F.R. § 1501.4, § 1508.9 (an EA is a "concise public document . . . that serves to . . . briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."). If, based on the EA findings, the agency determines that the proposed action will not have a significant effect on the environment, the agency does not have an obligation to prepare an EIS. It must, however, memorialize this process with a Finding of No Significant Impact ("FONSI"). *See* 40 C.F.R. § 1501.4(e); *see also* 40 C.F.R. § 1508.13 (defining a FONSI as "a document by a Federal agency briefly presenting the reasons why an action . . . will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared").

Plaintiffs argue that BLM has violated NEPA through its: (1) failure to prepare an EA that properly analyzes the cumulative effects of the project; (2) failure to prepare an EIS; and (3) failure to supplement existing NEPA analysis based on the discovery of new information.

*1. The EA Cumulative Impacts Analysis is Sufficient*

An EA must "include brief discussions of the need for the proposal, of alternatives [to the proposed action] . . . of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R.

§ 1508.9(b). Impact includes "cumulative impacts;" in the NEPA context, cumulative impact is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency ... or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

Plaintiffs argue that the BLM did not analyze, either qualitatively or quantitatively, the cumulative impacts of the Project when combined with the effects of past, current, and future projects. While conceding that BLM did identify and compile a list of past, present and future actions, plaintiffs argue that BLM failed to "seriously evaluate" the impacts of these activities. Pls.' Mot. for Summ. J. at 15. The major flaw, plaintiffs argue, is the agency's focus on incremental damage, and the failure to "quantify the broad range of impacts from each project, let alone add them together to meaningfully assess the total impacts." *Id; see also id.* at 15–17 (arguing that the agency did not analyze cumulative effects on geologic conditions, soils, vegetation, or the ecosystem).

 While plaintiffs may disagree with the conclusions reached in the EA, and even correctly argue that the cumulative impacts analysis could be more comprehensive, plaintiffs' contention that "they would have done more" does not render the cumulative impacts analysis violative of NEPA. At bottom, "the agency's EA must give a realistic evaluation of the total impacts and cannot isolate a pro-

posed project, viewing it in a vacuum." *Grand Canyon Trust v. F.A.A.*, 290 F.3d 339, 342 (D.C.Cir.2002). The Court is persuaded that the EA accomplished this function. The BLM devoted a full chapter of the EA to the potential cumulative impacts of the project, and also analyzed the project's cumulative environmental impacts throughout the EA. *See* EA Chapter 4, AR 195–200 (discussing present and past actions in the area, foreseeable future actions, and the cumulative impacts of all activities); EA, AR 144–145 (identifying existing sources of air pollution in the area, discussing the Project's added impacts, and concluding there would be temporary increases in dust levels and emissions); EA, AR 144–149 (relying on existing studies [11] in a discussion of existing soil conditions, and discussing the acreage of soil disturbance that would result from the Project); EA, AR 150 (quantifying and identifying existing vegetation in the project area and quantifying, in acres, the Project's effects on vegetation); EA, AR 199 (determining that cumulative impacts to WSAs would be "temporary to short-term" when added to "the 20 acres of drill pads, 12.5 miles of roads, and approximately five miles of pipeline that currently exist within or border WSAs"). It is thus clear that the EA charts past, present and future actions, including estimates of acreage of disturbance. *See* EA, AR 197, Table 4–1 (showing total acreage of disturbance in the area, when all actions' impacts are totaled, amounts to 2,189 acres).

In addition, the Court notes that the record reveals that the acreage of estimated disturbance from the Seismic Pro-

---

**11.** This reliance on previous studies in the context of cumulative impacts analysis is proper, as the agency "is not required to duplicate the analysis of earlier studies when considering cumulative impact, but rather may incorporate the findings of a previous study into the background data used to assess the impact of the new project." *Young v. General Services Admin.*, 99 F.Supp.2d 59, 78–79 (D.D.C.2000).

ject is 11.5 acres. EA, AR 197, Table 4–1. When this estimated disturbance is compared with the 57,500 acre project area, the agency's characterization of the Project's "light footprint" appears rational, as does the conclusion that the Project's incremental impacts would be minimal. *See generally* EA Chapter 4; AR 198–200 ("Impacts identified for this alternative, in conjunction with any negative impacts of other past, present, or reasonably foreseeable future actions would result in negligible impacts to natural and cultural resources."); *see also* EA, AR 198 (concluding that the Project would have "little or no added negative effects on water resources," noting that Best Management Practices would mitigate cumulative impact).

Again, plaintiffs are likely correct that the cumulative impacts analysis is not perfect; that is not, however, the question the Court faces in its review of agency action. Here, the Court is satisfied that BLM adequately analyzed the cumulative impacts of the instant project, including adding its short term effects to the backdrop of other activities in the area.

*2. An EIS Was Not Required*

■■■ An agency decision that an EIS is not required is afforded deference, and may be overturned "only if it was arbitrary, capricious or an abuse of discretion." *Sierra Club v. United States Dep't of Transportation,* 753 F.2d 120, 126 (D.C.Cir.1985). However, "if any 'significant' environmental impacts might result from the proposed agency action then an EIS must be prepared before agency action is taken." *Sierra Club v. Peterson,* 717 F.2d 1409, 1415 (D.C.Cir.1983). This Circuit reviews an agency's finding of no significant impact to determine whether:

First, the agency [has] accurately identified the relevant environmental concern. Second, once the agency has identified

the problem it must have taken a 'hard look' at the problem in preparing the EA. Third, if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding. Last, if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that the changes or safeguards in the project sufficiently reduce the impact to a minimum.

*Town of Cave Creek, Arizona v. F.A.A.,* 325 F.3d 320, 327 (D.C.Cir.2003).

Plaintiffs argue that the BLM has not made the case for a finding of no significant impact, relying heavily on regulations delineating the factors used to determine "significance." These factors include

(3) *Unique characteristics* of the geographic area such as proximity to historic or cultural resources ... (4) The degree to which the effects on the quality of the human environment are likely to be highly *controversial* ...(7) Whether the action is related to other actions with individually insignificant but *cumulatively significant impacts* ...(8) The degree to which the action may *adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places* or may cause loss or destruction of significant scientific, cultural, or historical resources.

40 C.F.R. § 1508.27(b)(emphasis added).

Taking each of these factors in turn, plaintiffs argue that the project area is unique for its rock art, cliff dwellings, pit houses, and wilderness study areas; proof of this uniqueness, they aver, is found in BLM's designation of portions of the area as eligible for listing on the National Register of Historic Places. The Project is highly controversial, plaintiffs continue, largely because of the BLM's decision to

limit Class III cultural surveys to a 100 foot parameter. As further evidence of the Project's controversial nature, plaintiffs note that the National Trust has requested that the BLM reopen the NHPA process in light of new information about the Project's impacts on cultural resources, and that over 24,000. Finally, plaintiffs posit that, due to the failure to increase the breadth of the identification area to identify cultural resources, the Project is likely to "adversely affect districts ... eligible for listing in the National Register of Historic Places ... [and] cause loss or destruction of significant scientific, cultural, or historical resources." 40 C.F.R. § 1508.27(b). Thus, plaintiffs conclude that BLM has not met its burden to demonstrate why an EIS is not necessary.

■ The determination of whether BLM should have prepared an EIS turns largely on whether the EA was adequately conducted and properly took cumulative impacts into account. As noted *supra* Part III.B.1, the Court finds the EA fully complies with NEPA requirements. It is also clear, applying the aforementioned four part test, that the "relevant areas of environmental concern" were identified— namely, BLM properly conducted a survey of the known and unknown cultural resources in the project area. *See* EA, AR 182–187 (detailing the impacts of the Project on cultural resources). Further, the "significance factors" were fully analyzed and discussed during the EA process that resulted in a FONSI. *See* AR 17–21 (analyzing the ten significance factors set out in 40 C.F.R. § 1508.13). Much of the "controversy" on which plaintiffs heavily rely has abated, as the Advisory Council received the information regarding Dr. Allison's new findings, and still deemed the Project sufficiently safe to go forward. Concerns about the uniqueness of the area, and about "loss or destruction of sig-

nificant scientific, cultural, or historical resources" have been adequately addressed through the extensive NHPA process; indeed, the BLM has undertaken additional surveys in order to prevent the loss of cultural resources. Moreover, the Advisory Council's and the SHPO's NHPA concurrence cannot be ignored, as this concurrence evidences a small likelihood of significant effects on the environment, and specifically cultural resources.

■ As BLM correctly argues, when mitigation measures adequately reduce adverse impacts to an insignificant level, an EIS need not be prepared. *See Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson,* 685 F.2d 678, 682 (D.C.Cir.1982) (if "the proposal is modified prior to implementation by adding specific mitigation measures which completely compensate for any possible adverse environmental impacts stemming from the original proposal, the statutory threshold of significant environmental effects is not crossed and an EIS is not required."). The agency has made a "convincing case" that any adverse impacts are likely insignificant, or will be mitigated by the imposition of BLM's on the ground measures. Specifically, the required presence of on-site third party archaeologists and ground vibration experts, the undertaking of additional surveys, and the pre-Project testing of vibration levels will compensate for any potential effects to cultural resources.

■ The Court's role in reviewing the agency's decision not to prepare an EIS is limited; the Court need only "ensure, primarily, that no arguably significant consequences have been ignored; evaluating the 'impact' of those consequences on the 'quality of the human environment,' however, is 'left to the judgment of the agency,' and [the court should] intervene only where that judgment is shown to be irra-

tional." *Public Citizen v. Nat'l Highway Traffic Safety Admin.*, 848 F.2d 256, 266 (D.C.Cir.1988). Given this deference to the agency, and crediting the agency's 18–month study of the Project, the Court finds that BLM met its burden to issue a FONSI "presenting the reasons why an action ... will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared." 40 C.F.R. § 1508.13.[12]

3. *Supplementation of the NEPA Analysis Was Not Required*

Supplementation of a NEPA analysis is required when "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns; or [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1). An agency "may also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so." 40 C.F.R. 1502.9(c)(2). Thus, an agency's duty does not end with the conclusion of the EA or EIS process: "It would be incongruous

with ... the Act's manifest concern with preventing uninformed action, for the blinders to adverse environmental effects, once unequivocally removed, to be restored prior to the completion of agency action simply because the relevant proposal has received initial approval." *Marsh v. Oregon Natural Resources*, 490 U.S. 360, 371, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). However,

> an agency need not supplement an EIS every time new information comes to light after the EIS is finalized ... the decision whether to prepare a supplemental EIS is similar to the decision whether to prepare an EIS in the first instance: If there remains 'major Federal actio[n]' to occur, and if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared.

*Id.* at 373–74, 109 S.Ct. 1851 (internal citation and quotation omitted).

Plaintiffs argue that on April 10, 2004, SUWA notified the BLM of two studies

---

12. Plaintiffs also argue that the BLM inappropriately prejudged the NEPA issues and thus the agency's decision not to prepare an EIS is due less deference than this Court would normally afford. The record is clear that in July 2003—two months before the EA was released for public comment and eight months before the FONSI and Decision Record were signed—the local BLM manager told his staff he decided that an EIS would not be prepared. Pls.' Mot. for Summ. J. at 18–19; *see* AR 2019 (BLM manager stating "My goal is to have a document ready for a thirty-day public comment period beginning August 18, 2003. Since this is the second year of this project, it is presently the field office's No. 1 priority and it is my intention to issue a decision record this year"); AR 1982 (Field office manager stating "Pat [Gubbins] stated that he

talked with EPA and not sure which way is best way to go. Not going with EIS. This has been discussed and the State Office has said we will be doing EA."). Plaintiffs argue that these statements evidence "that the BLM was committed to allowing BBC to proceed without having to prepare an EIS and regardless of the comments provided by BLM staff, outside expert agency analysis (such as the Environmental Protection Agency), and public input." Pls.' Mot. for Summ. J. at 19–20. However, evidence that a project is a priority for an office does not lead to a conclusion that the decision was "prejudged." As BLM's counsel stated during oral argument, the statements likely only evidence "the intent that this project had taken two years and it was time to move it forward." Tr., 6/28/04 at 80.

prepared by Dr. Allison; one a literature review, and the other a report of Dr. Allison's on-the-ground research in the project area. The letter informed BLM that Dr. Allison had recently documented four previously unrecorded sites, and that Dr. Allison concluded "it is almost certain that hundreds of potentially affected sites have not been identified." Letter from SUWA to BLM Field Office of 4/10/04. Plaintiffs argue that this new information, coupled with the National Trust's formal request to reopen NHPA consultation, triggered the agency's continuing duty to take a "hard look" at environmental impacts. Plaintiffs thus conclude that the agency's failure to engage in a supplemental NEPA analysis renders the FONSI and DR violative. of NEPA, and therefore the BLM's decision to go forward with the Project constitutes arbitrary and capricious agency action.

 While at first blush Dr. Allison's discovery appears "significant," plaintiffs face the same uphill battle they could not surmount in the NHPA context. Specifically, evidence that the resources may *exist* does not itself trigger a duty to supplement the NEPA process. As BLM concisely states,

> Dr. Allison does not provide any new information to dispute BLM's findings that cultural resources will not be impacted from the seismic survey or otherwise contradict BLM's finding that the vibroseis buggies will not generate ground motion in excess of 0.35 inches per second at 50 feet, which is well below the 0.75 inches per second threshold. *BLM was well aware after reviewing the 59 archaeological surveys previously done in the vicinity of the Project area and completing two Class III surveys that there might be unidentified cultural resources in the Project area, including those Dr. Allison claims to have recently identified.*

Defs.' Mot. for Summ. J. at 27 (emphasis added). Thus, Dr. Allison's discovery of cultural resources outside of the 50 foot area was not "new" information; rather, the agency planned for such discoveries. It is precisely because of the recognition that new resources could be discovered that the BLM established a Project Monitoring Plan, and provided for daily Project oversight. *See* FONSI/DR, AR 21; Special Conditions–Geophysical Exploration, AR 229–237; Environmental Compliance and Post–Project Monitoring Plan, AR 287–297. BLM required BBC to employ a minimum of three on the ground experts, including an archaeologist who will conduct additional surveys around source points prior to exploration commencement. FONSI/DR, AR 15. If a resource is discovered, "the EA specifically says that they're going to move these source points within the buffer zones required in the BLM geophysical handbook." Statement of BLM Counsel, Tr. 6/28/04 at 72; Environmental Compliance and Post–Project Monitoring Plan, AR 292. Additionally, the third-party environmental compliance monitor has the authority to immediately terminate the exploration activities if she determines that the vibrations are approaching levels that could pose a threat to nearby cultural resources. Environmental Compliance and Post–Project Monitoring Plan, AR 291.

Accordingly, the Court concurs with BLM's assertion that "through these mitigation measures, BLM has ensured that cultural resources, even those Plaintiffs' consultant claims to have recently identified, are protected during the course of the three-month Stone Cabin Project." Defs.' Mot. for Summ. J. at 29; *see also* AR 230 (setting forth special conditions for the Project). BLM's undertaking of the original cultural resource surveys, coupled with mitigation measures designed to prevent

harm to any undiscovered resources, derail plaintiffs' claims of certain harm to these resources. Plaintiffs have not met their burden to demonstrate that the "new" information is "significant [to an] extent not already considered," *Marsh,* 490 U.S. at 373–374, 109 S.Ct. 1851, as the possibility of undiscovered resources was specifically contemplated and planned for during the NEPA process. Supplementation is therefore not necessary or required.

## C. Federal Land Policy and Land Management Act (FLPMA)

Under FLPMA, BLM's statutory mandate is to manage public lands "on the basis of multiple use and sustained yield," 43 U.S.C. § 1701(a)(7), and manage the lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition." 43 U.S.C. § 1701(a)(8). The FLPMA requires the Secretary of the Department of Interior to "prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values (including, but not limited to, outdoor recreation and scenic values), giving priority to areas of critical environmental concern." 43 U.S.C. § 1711(a). Further, FLPMA mandates that the Secretary review certain "roadless areas of five thousand acres or more" and provide the President with recommendations concerning the "suitability or nonsuitability" of each area for preservation as wilderness. *See* 43 U.S.C. § 1782(a). These areas under wilderness designation review are called Wilderness Study Areas ("WSA"). Accordingly, the FLPMA requires the BLM to manage public lands within a WSA "in a manner so as not to impair the suitability of such areas for

preservation as wilderness." 43 U.S.C. § 1782(c).

The BLM's binding interpretation of this non-impairment mandate is the Interim Management Policy and Guidelines for Lands Under Wilderness Review ("IMP"), which "describes the policies under which the BLM will manage lands under wilderness review until Congress either designates these lands as wilderness or releases them for other purposes." IMP at 1; IMP at 3 (defining non-impairment mandate). While this non-impairment standard requires that the Secretary protect the "wilderness values of each WSA," it is equally clear that some use of WSAs is permitted so long as the uses are "only temporary uses that do not create surface disturbances or involve permanent placement of structures." IMP at 5. Accordingly, the BLM reviews all proposals for use within WSAs to determine whether the use is "non-impairing;" use of WSA land is considered "non-impairing" if it meets the following criteria:

> (1)The use ... must be *temporary.* This means a temporary use that does not create surface disturbance or involve permanent placement structures...(2) When the use ... is terminated, the *wilderness values must not have been degraded* so far as to significantly constrain the Congress' prerogative regarding the area's suitability for preservation as wilderness.

IMP at 9, I.B.2 (emphasis added).

 Plaintiffs' FLPMA claim rests on the assertion that heliportable drilling in the Jack Canyon and Desolation Canyon Wilderness Study Areas ("WSAs") will violate the FLPMA's non-impairment standard, as such drilling will cause disruption to soils and vegetation that will require reseeding amounting to impermissible "reclamation." *See* 43 U.S.C. § 1782(c) (requiring the BLM to manage public lands

within a WSA "in a manner so as not to impair the suitability of such areas for preservation as wilderness"); IMP at 9 (defining surface disturbance as "any new disruption of the soil or vegetation which would necessitate reclamation within a WSA."). Specifically, plaintiffs point to a single page of the EA, which states that "re-seeding" of shot hole locations in the WSA will be necessary "where vegetation had been disturbed or lost from drilling operations," as evidence that impermissible reclamation will occur. EA, AR 176. Plaintiffs argue that such re-seeding amounts to an impermissible impairment of the WSA, as the IMP is clear that "uses and facilities requiring reclamation (i.e., re-contouring of the topography, replacement of topsoil, and or *restoration of native plant cover* ) are definitely surface disturbing and must be denied." IMP at 9 (emphasis added).

However, defendants persuasively counter that no re-seeding or reclamation will occur in the WSA, and that the IMP makes clear that "seismic and inventory information gathering by helicopter or other means not requiring road blading or improvement may be allowed if it satisfies the impairment criteria." IMP, III.B.1.e, at 32. The Court is persuaded that the BLM met its obligation to ensure that the Project does indeed comply with the non-impairment criteria. First, defendants correctly note that the portion of the EA plaintiffs cite is actually discussing Alternative A-an alternative *not chosen* by the

BLM. Second, the *selected* Alternative B authorizes heliportable drilling in the non-road portions of the WSAs, a drilling method designed to *prevent* the need for reclamation:

Within the WSAs, approximately 228 heliportable source points would be drilled . . . Upon completion of drilling, and *without the need for reclamation*, the individual sites will appear natural to the average visitor. Implementation of the agency selected alternative *would not impair the WSA's suitability for preservation as wilderness and would be consistent with Interim Management Policy* (IMP).

FONSI/DR, AR 15 (emphasis added); *see also* Errata Sheet, AR 31 (correcting page 2–20 of the EA to state that "Seeding would not occur within the WSAs"); Errata Sheet, AR 73 (correcting AR 179 to state "Upon completion of drilling, and without reclamation, the individual drill sites will appear natural to the average visitor.").[13]

Deferring as it must to agency decision-making, the Court credits BLM's record evidence, as well as the in-court representations of counsel, that re-seeding will not occur in the WSA's. *See* Errata Sheet, AR 31; FONSI/DR, AR 15; *see also* Defs.' Mot. for Summ. J. at 31–32 (noting that the agency relied on "recent compliance reports and project monitoring summaries prepared for two other recent geophysical seismic surveys within Utah," namely the

13. Plaintiffs argue that the errata sheets are a "blatant attempt to circumvent FLPMA's non-impairment mandate" and are simply an "about-face [designed] to permit these activities;" it appears plaintiffs are alleging that BLM is proceeding in bad faith. Pls.' Mot. for Summ. J. at 31–32. However, BLM persuasively argues that the errata sheets to the EA are consistent with the resultant DR and the chosen alternative, and that the errata sheets merely correct drafting errors in the EA. *See* Defs.' Mot. for Summ. J. at 31, n. 18;

AR 179 (explaining that under BLM's preferred alternative, impacts would be substantially reduced compared to buggy-drilling, would be entirely short term, and *"would not result in impacts that would impair the WSAs' suitability for preservation as wilderness "*) (emphasis added). Absent persuasive evidence from plaintiffs that BLM's use of the errata sheets is in bad faith, which plaintiffs have *not* produced, the Court will credit BLM's explanation.

WesternGeco Horse Point 3–D Seismic exploration project in Uintah County, Utah and the Veritas Uintah 2–D seismic survey in Uintah County, Utah). Accordingly, the Court upholds the agency's decision-making process as in accordance with FLPMA.

**CONCLUSION**

Accordingly, for the reasons set forth herein, it is hereby

**ORDERED** that defendants'/intervenors' Motion for Summary Judgment is **GRANTED**; and it is

**FURTHER ORDERED** that plaintiffs' Motion for Summary Judgment is **DENIED**; and it is

**FURTHER ORDERED AND ADJUDGED** that the Clerk shall enter final judgement in favor of defendants and against plaintiffs on all claims; and it is

**FURTHER ORDERED** that the Clerk of the Court is directed to remove this case from the active calendar of the Court.

An appropriate Order accompanies this Memorandum Opinion.