430 F.3d 584
 BUSINESS AND RESIDENTS ALLIANCE OF EAST HARLEM, an unincorporated association, Raymond Plumey, P.C., John Kozler, Irene Smith, and Pasquale Palmieri, Plaintiffs-Appellants,
Gloria Quinones, Thomas Donovan, and Charles Iulo, Plaintiffs,
v.
Alphonso JACKSON,[1] in his official capacity as Secretary of the United States Department of Housing and Urban Development, Michael O. Leavitt,[2] in his official capacity as Secretary of the United States Department of Health and Human Services, Upper Manhattan Empowerment Zone Corporation, New York Empowerment Zone Corporation, and Tiago Holdings, LLC, Defendants-Appellees.
Docket No. 04-4493-CV.
 United States Court of Appeals, Second Circuit.
 Argued: September 27, 2005.
 Decided: November 22, 2005.
 
 Kevin J. Farrelly, Law Offices of Kevin J. Farrelly, New York, NY, for Plaintiffs-Appellants.
 Lawrence H. Fogelman, Assistant United States Attorney for the Southern District of New York for David N. Kelley, United States Attorney (Sara L. Shudofsky, Assistant United States Attorney, of counsel), New York, NY, for Defendants-Appellees Alphonso Jackson and Michael O. Leavitt.
 O. Peter Sherwood, Manatt, Phelps & Phillips, LLP, New York, NY, for Defendants-Appellees Upper Manhattan Empowerment Zone Development Corporation and New York Empowerment Zone Corporation.
 Karen Binder, Wachtel & Masyr, LLP (Jesse Masyr, of counsel), New York, NY, for Defendant-Appellee Tiago Holdings, LLC.
 Before: CALABRESI, KATZMANN, and B.D. PARKER, Circuit Judges.
 KATZMANN, Circuit Judge.
 
 
 1
 The New York City Empowerment Zone was created pursuant to a Congressional act and was awarded $100 million in federal block grants to foster the revitalization of economically distressed areas. This case raises an issue of first impression: whether the Zone's subsequent use of those federal funds in connection with individual projects triggers the historic preservation review process set forth in Section 106 of the National Historic Preservation Act, 16 U.S.C. § 470f. The plaintiffs argue that it does, and therefore contend that construction of the East River Plaza project, a planned East Harlem retail shopping complex to which the Zone has allocated $5 million from the previously-awarded federal block grants, cannot go forward until a Section 106 review of the project is conducted. We hold that because all approval and funding decisions as to the East River Plaza project are made at the state and local level, Section 106 — which is triggered only when a federal agency has jurisdiction or licensing authority over the project at issue — is inapplicable here. We therefore affirm the district court's grant of summary judgment to the defendants.
 
 I.
 A.
 
 2
 1. The New York City Empowerment Zone: Statutory and Administrative Background
 
 
 3
 In the Omnibus Budget Reconciliation Act of 1993 ("OMBRA"), Pub.L. No. 103-66, 107 Stat. 312 (1993), Congress provided for the creation of empowerment zones and enterprise communities to promote the "[r]evitalization of economically distressed areas through expanded business and employment opportunities." H.R.Rep. No. 103-111, at 791 (1993), as reprinted in 1993 U.S.C.C.A.N. 378, 1021. As part of the OMBRA, Congress authorized the United States Department of Housing and Urban Development ("HUD") to designate up to six urban empowerment zones that would each receive various tax incentives as well as up to $100 million in federal block grant funds from the United States Department of Health and Human Services ("HHS") to stimulate economic and social renewal. Pub.L. No. 103-66 § 13761; 42 U.S.C. § 1397f; 60 Fed.Reg. 3034-01, at 3034. Congress further provided that local governments could nominate areas for empowerment zone status, and required any application for an empowerment zone to include a "strategic plan" that
 
 
 4
 (A) describes the coordinated economic, human, community, and physical development plan and related activities proposed for the nominated area,
 
 
 5
 (B) describes the process by which the affected community is a full partner in the process of developing and implementing the plan and the extent to which local institutions and organizations have contributed to the planning process,
 
 
 6
 (C) identifies the amount of State, local, and private resources that will be available in the nominated area and the private/public partnerships to be used, which may include participation by, and cooperation with, universities, medical centers, and other private and public entities,
 
 
 7
 (D) identifies the funding requested under any Federal program in support of the proposed economic, human, community, and physical development and related activities,
 
 
 8
 (E) identifies baselines, methods, and benchmarks for measuring the success of carrying out the strategic plan, including the extent to which poor persons and families will be empowered to become economically self-sufficient, and
 
 
 9
 (F) does not include any action to assist any establishment in relocating from one area outside the nominated area to the nominated area, except that assistance for the expansion of an existing business entity through the establishment of a new branch, affiliate, or subsidiary is permitted if —
 
 
 10
 (i) the establishment of the new branch, affiliate, or subsidiary will not result in a decrease in employment in the area of original location or in any other area where the existing business entity conducts business operations, and
 
 
 11
 (ii) there is no reason to believe that the new branch, affiliate or subsidiary is being established with the intention of closing down the operations of the existing business entity in the area of its original location or in any other area where the existing business entity conducts business operation[s].
 
 
 12
 26 U.S.C. § 1391(f)(2).
 
 
 13
 Pursuant to this application process, HUD designated the New York City Empowerment Zone — an area comprising certain sections of Upper Manhattan and the South Bronx — as one of the six initial urban empowerment zones. HHS, in turn, proceeded to make two $50 million grants, one in 1994 and one in 1995, to the New York City Empowerment Zone. These grants were issued to entities that subsequently became known as the Empire State Development Corporation ("ESDC"), a New York State agency. The $100 million remains in an HHS "draw-down" account, from which ESDC can withdraw funds without advising HHS of the specific purpose for which the funds will be used. New York State and New York City also each pledged an additional $100 million to the New York City Empowerment Zone, to be paid over a ten-year period. Thus, the Zone ended up with a total investment pool of $300 million, drawn equally from the federal, state, and city governments.
 
 
 14
 Several local entities were created to manage the operation and funding of the Zone. The ESDC created the New York Empowerment Zone Corporation ("NYEZC"), which is charged with reviewing and monitoring the empowerment zone program. New York State holds 51% of the stock of NYEZC, and New York City holds the other 49%. In addition, the residents of Upper Manhattan created the Upper Manhattan Empowerment Zone Development Corporation ("UMEZDC") to develop initiatives for, and administer funds to, their portion of the Zone. The Bronx Overall Economic Development Corporation ("BOEDC") was similarly created for the South Bronx. Representatives from UMEZDC and BOEDC sit on the board of directors of the NYEZC, along with state and city representatives. In addition, an HUD representative participated as a non-voting director of the NYEZC until 2002, at which point HUD discontinued its participation.
 
 
 15
 Two memoranda serve to document and clarify the relationships among the various entities described above. First, a Memorandum of Agreement among HUD, New York State, and New York City provides that the State and City shall submit semi-annual reports and annual narrative summaries to HUD regarding actions taken in accordance with the strategic plan for the New York City Empowerment Zone, and that HUD shall make periodic findings on the continuing eligibility and validity of the designation of the Zone. It further provides that HUD may revoke the "empowerment zone" designation if it is determined that the Zone has (1) modified the boundaries of the area; (2) failed to make progress in achieving the benchmarks and goals of the Strategic Plan; or (3) not complied substantially with the goals of the Strategic Plan. This de-designation provision closely tracks the statutory language of 26 U.S.C. § 1391, which provides that designation of an empowerment zone can be revoked by HUD upon a determination that the state or local government "(A) has modified the boundaries of the area, or (B) is not complying substantially with, or fails to make progress in achieving the benchmarks set forth in, the strategic plan." 26 U.S.C. § 1391(d)(2).
 
 
 16
 Second, a Memorandum of Understanding among New York State, New York City, the ESDC, NYEZC, UMEZDC, BOEDC, the Bronx Borough President, and the United States Representatives for the 15th and 16th Congressional Districts provides that the local entities — namely, UMEZDC and BOEDC — will select and develop project proposals for their respective regions of the Zone, and will then submit these proposals to NYEZC for approval. It further provides that when such projects are approved to receive Zone funding, ESDC is responsible for disbursing the appropriate federal block grant funds and the New York State-provided funds to NYEZC, and that the New York City Department of Business Services is responsible for disbursing the appropriate city funds to the NYEZC. NYEZC is then, in turn, to disburse such funds to UMEZDC or BOEDC, as applicable.
 
 2. The East River Plaza project
 
 17
 In 1996, defendant-appellee Tiago Holdings, LLC ("Tiago"), a real estate developer, proposed a large shopping center development project — to be known as East River Plaza — in East Harlem, a neighborhood that falls within the boundaries of the New York City Empowerment Zone and within the region covered by UMEZDC. The plans for East River Plaza called for a 500,000 square foot, four-story retail shopping complex, located between 116th and 119th Streets along the Franklin Delano Roosevelt Drive. At the time, the present occupant of that site was the vacant Washburn Wire Factory, which had been constructed during the early 1900s by descendants of Ichabod Washburn (an inventor of early wire production processes) and had ceased operations as of 1976. Tiago's proposed plans for the East River Plaza required a demolition of the Washburn Wire Factory buildings. In connection with these plans, the New York State Office of Parks, Recreation and Historic Preservation conducted a historic resource review, and determined that the Washburn Wire Factory did not meet the criteria for inclusion in the National Register of Historic Places and that the East River Plaza project would have no impact on surrounding sites that might be eligible for inclusion in the National Register. The National Park Service of the United States Department of the Interior subsequently reviewed and affirmed New York State's decision not to nominate the Washburn Wire Factory to the National Register.
 
 
 18
 Tiago projected the cost of the East River Plaza project to be $160 million,[3] and requested $15 million in loans from UMEZDC for the project. On September 10, 2001, the UMEZDC staff issued a written recommendation that this loan be granted, noting that East River Plaza was likely to enhance the physical revitalization of East Harlem, to spread new development activity eastward to East Harlem, and to create approximately 1,400 full-time jobs. On October 22, 2001, the Board of Directors of UMEZDC voted in favor of Tiago's request for $15 million in financing, and authorized UMEZDC to submit the project to the NYEZC for funding approval. On November 16, 2001, NYEZC's Board of Directors voted to approve the requested $15 million loan — projected to come equally from city funds, state funds, and the previously-awarded federal block grants, as is the NYEZC's typical practice — in funding for East River Plaza. Thus, a total of $5 million in federal block grant money was slated for the project.
 
 
 19
 On February 10, 2003, after the demolition of the Washburn Wire Factory began, one of the plaintiffs in this action contacted the president of UMEZDC to request that in light of the planned allocation of federal funds to the East River Plaza project, a historic preservation review pursuant to Section 106 of the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470f, be conducted for the project. It is undisputed, however, that no Section 106 review took place.
 
 B.
 
 20
 The plaintiffs proceeded to file suit under Section 106 of the NHPA, seeking (1) a declaratory judgment that HUD and HHS were obliged to conduct a historic preservation review of the East River Plaza project pursuant to Section 106, given the planned use of $5 million in federal funds for the project; (2) an injunction enjoining NYEZC, UMEZDC, and Tiago from continuing with the demolition of the Washburn Wire Factory until a Section 106 review had been completed;[4] and (3) legal fees and costs. The defendants opposed the plaintiffs' motion for a preliminary injunction and filed a cross-motion to dismiss the complaint for failure to state a claim, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.
 
 
 21
 By Memorandum and Order dated August 19, 2003, the district court denied plaintiffs' motion for a preliminary injunction, finding that they had demonstrated neither a likelihood of success on the merits nor irreparable harm. After the issuance of this order, the remaining sections of the Washburn Wire Factory were demolished. On June 11, 2004, the district court issued a Memorandum and Order converting the defendants' motion to dismiss into a motion for summary judgment,[5] and granting the defendants' motion on grounds that despite the likely usage of $5 million in federal block grant funds for the East River Plaza project, there was insufficient federal involvement or control over the project to trigger review under Section 106.
 
 This appeal followed.[6]
 II.
 A.
 
 22
 At the outset, we note the applicable standard of review. We review a grant of summary judgment de novo, construing the record in the light most favorable to the non-moving party. See, e.g., Bourdon v. Loughren, 386 F.3d 88, 92 (2d Cir.2004). Where, as here, no disputed issues of material fact exist, "our task is to determine whether the district court correctly applied the law." Pagan v. NYNEX Pension Plan, 52 F.3d 438, 441 (2d Cir.1995) (internal quotation marks omitted).
 
 B.
 
 23
 Before evaluating the merits of the plaintiffs' claim under Section 106 of the NHPA, we pause to note that both the parties and the district court assumed that the NHPA provides the plaintiffs with a private right of action in this case. This Circuit has not yet addressed that issue,[7] but because this is a statutory question rather than one of Article III jurisdiction, we need not resolve it where the case can otherwise be resolved in the defendants' favor. See, e.g., Narragansett Indian Tribe v. Warwick Sewer Auth., 334 F.3d 161, 166 n. 4 (1st Cir.2003) (similarly declining to reach the question of whether a private right of action exists under the NHPA). For the reasons set forth below, we conclude that the case can be so resolved, and thus assume, without deciding, that the plaintiffs were entitled to bring this action pursuant to Section 106 of the NHPA.
 
 
 24
 The NHPA, which was passed in 1966, has a fairly broad mandate, in keeping with the longstanding Congressional interest in historic preservation. See WATCH v. Harris, 603 F.2d 310, 320-26 (2d Cir.1979). It "requires each federal agency to take responsibility for the impact that its activities may have upon historic resources, and establishes the Advisory Council on Historic Preservation . . . to administer the Act." Nat'l Mining Ass'n v. Fowler, 324 F.3d 752, 755 (D.C.Cir.2003) (internal quotation marks omitted). In this regard, Section 106 of the NHPA provides that
 
 
 25
 The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under Title II of this Act a reasonable opportunity to comment with regard to such undertaking.
 
 
 26
 16 U.S.C. § 470f.
 
 
 27
 Section 106 is therefore primarily procedural in nature. See, e.g., Morris County Trust for Historic Pres. v. Pierce, 714 F.2d 271, 278-79 (3d Cir.1983). It does not itself require a particular outcome, but rather ensures that the relevant federal agency will, before approving funds or granting a license to the undertaking at issue, consider the potential impact of that undertaking on surrounding historic places. As such, courts have sometimes referred to Section 106 as a "stop, look, and listen" provision. See, e.g., Illinois Commerce Comm'n v. Interstate Commerce Comm'n, 848 F.2d 1246, 1260-61 (D.C.Cir.1988); Pres. Coalition, Inc. v. Pierce, 667 F.2d 851, 859 (9th Cir.1982).
 
 
 28
 The plaintiffs argue that the planned allocation of $5 million in federal funds to the East River Plaza project[8] automatically triggers a Section 106 review of the project. They point out that Section 301 of the NHPA defines an "undertaking" as "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including . . . those carried out with Federal financial assistance." 16 U.S.C. § 470w(7)(B). They contend that as a result, the East River Plaza project must be an undertaking for purposes of the NHPA.
 
 
 29
 We note initially that under the definition set forth in Section 301, it is not entirely clear whether all projects carried out with federal financial assistance are "undertakings," or whether only those projects that actually receive their funding "under the direct or indirect jurisdiction of a Federal agency" qualify as undertakings. Cf. Sheridan Kalorama Historical Ass'n v. Christopher, 49 F.3d 750, 755 (D.C.Cir.1995) (noting a similar ambiguity with respect to projects that require federal licenses). The definition of "undertaking" contained in the most recent NHPA regulations promulgated by the ACHP mirrors the definition set forth in Section 301, and thus does not clarify this issue. See 36 C.F.R. § 800.16(y) (defining "undertaking" as a "project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including . . . those carried out with Federal financial assistance").
 
 
 30
 It is, however, unnecessary for us to reach this question. Even assuming that the East River Plaza is an "undertaking" under the Section 301 of the NHPA solely by virtue of its planned receipt of federal block grant funds, Section 106 itself still applies only to two types of entities: first, any Federal agency "having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking," and second, "any Federal department or independent agency having authority to license any undertaking." See Sheridan Kalorama, 49 F.3d at 755 ("[H]owever broadly the Congress or the ACHP define `undertaking,' § 106 applies only to: 1) `any Federal agency having . . . jurisdiction over a proposed Federal or federally assisted undertaking'; and 2) `any Federal . . . agency having authority to license any undertaking'" (quoting 16 U.S.C. § 470f)); see also Fowler, 324 F.3d at 759-60. Thus, unless either of the federal agency defendants — HUD and HHS — can be said to have jurisdiction or licensing authority over the East River Plaza project, Section 106 is inapplicable to the project.
 
 
 31
 The plaintiffs have not attempted to claim that either HUD or HHS has the authority to license the East River Plaza project. Rather, the critical question is whether the project can be viewed as falling within the direct or indirect jurisdiction of HUD or HHS, given the project's planned receipt of $5 million in federal funds. That question, in turn, requires us to determine the meaning of "direct or indirect jurisdiction."
 
 
 32
 The NHPA nowhere explicitly defines the phrase "direct or indirect jurisdiction." Nor do the regulations that have been promulgated by the ACHP. See 36 C.F.R. § 800 et. seq. The text of Section 106 itself, however, provides an important clue as to the meaning of these words. In stating that "[t]he head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any state...shall, prior to the approval of the expenditure of any Federal funds on the undertaking . . . take into account the effect of the undertaking," 16 U.S.C. § 470f (emphasis added), the text indicates that to have a qualifying level of jurisdiction over the undertaking, the federal agency must have some degree of power to approve or otherwise control the expenditure of federal funds on that undertaking. Indeed, the evident purpose of Section 106 is to ensure that before federal funds are expended on an undertaking, the federal agency has taken into account the undertaking's potential impact on surrounding historic resources. See, e.g., Lee v. Thornburgh, 877 F.2d 1053, 1056 (D.C.Cir.1989) ("[A]n agency with jurisdiction over a federal or federally-assisted project must comply [with Section 106] before approving funds for it.") (emphasis added); Sheridan Kalorama, 49 F.3d at 755-756. If the federal agency has no direct or indirect power to effectuate the results of the Section 106 review by making a resultant funding decision, then such a review will be merely an empty exercise.
 
 
 33
 Here, based on a review of the particular statutory and administrative structure at issue, we conclude that neither HUD nor HHS has the power to control the expenditure of the federal block grant monies on the East River Plaza project. It is undisputed that HUD and HHS played no role in deciding to approve the total allocation of $15 million in NYEZC funds (including $5 million from the federal block grants) to the project. Rather, as set forth above, it was the staff of UMEZDC — the local development company for the Upper Manhattan portion of the New York City Empowerment Zone — that initially recommended the financing in question, after which point the UMEZDC Board of Directors voted to approve that funding. Thereafter, the proposal was submitted to the NYEZC, a corporation whose stock is held solely by New York City and New York State, for final approval. As such, the process by which these funds were allocated took place entirely at the state and local level. Indeed, the HUD officer with responsibility for the New York City Empowerment Zone during the relevant period submitted a sworn affidavit stating that HUD played no role in allocating or approving funds for the East River Plaza project, and that its involvement was limited solely to reviewing the project for compliance with the Zone's overall strategic plan. HUD's lack of participation in the funding process is fully consistent with the Memorandum of Agreement between HUD, New York State, and New York City, which does not provide HUD with such authority.
 
 
 34
 Nor does HUD or HHS have the ability to block ESDC from proceeding to withdraw the $5 million in question from the HHS draw-down account that contains the federal block grants awarded to the New York City Empowerment Zone. This is underscored by the fact that, as set forth in the sworn affidavit of an HHS officer who has worked with empowerment zones since 1993, ESDC is not even required to notify HHS of the purpose for which it draws down funds from these block grants. Indeed, it is undisputed that no federal agency has the ability to specifically block the expenditure of $5 million in federal funds for the East River Plaza project.
 
 
 35
 The plaintiffs suggest, however, that HUD still retains ultimate power over the $5 million in question — and therefore jurisdiction over the East River Plaza project — because of its ability to revoke the entire empowerment zone designation, and thereby take back the total remaining amount from the previously-awarded block grants.[9] This argument cannot prevail because its underlying factual premise is inaccurate. It is certainly true that HUD has the power to revoke the empowerment zone designation altogether. But pursuant to both 26 U.S.C. § 1391(d)(2) and the Memorandum of Agreement among HUD, New York State, and New York City, HUD's power to de-designate the New York City Empowerment Zone is very limited. It can do so only upon determining that (1) either the state or local government has modified the Zone's boundaries; (2) either the state or local government is not complying substantially with the Zone's strategic plan; or (3) either the state or local government has failed to make progress in achieving the benchmarks set forth in the Zone's strategic plan.
 
 
 36
 None of these findings could be triggered by the results of a Section 106 review of the East River Plaza project, even if such a review concluded — contrary to the previous determination of New York State Office of Parks, Recreation, and Historic Preservation — that the East River Plaza project was likely to have a negative impact on surrounding historic resources. Such a finding would plainly have no bearing on whether Zone's boundaries had been modified. More importantly, such a finding would likewise be irrelevant to an assessment of the Zone's level of compliance and progress with its strategic plan. As detailed in 26 U.S.C. § 1391(f), an empowerment zone's strategic plan addresses issues such as the involvement of local institutions and the community in the development of the geographic area, the extent to which poor individuals and family individuals will be empowered to become economically self-sufficient as a result of such development, and the like. The plaintiffs do not contend, and the record includes no evidence indicating, that the East River Plaza project itself has deviated from these considerations, let alone that the New York City Empowerment Zone as a whole has done so. On the contrary, the record indicates that funding for the East River Plaza project was approved by the relevant local and state organizations precisely because of the project's potential to create numerous jobs in the community and to promote the physical revitalization of East Harlem. It is likely for this reason that, when engaging in its limited review of the project for compliance with the Zone's strategic plan, HUD made no finding that the project was in any way inconsistent with that plan. The plaintiffs have not shown how any result from a Section 106 review of the East River Plaza project — a review that would exclusively assess the project's likely impact on surrounding historic resources, a factor not included in the Congressional list of considerations relevant to an empowerment zone's strategic plan, see 26 U.S.C. § 1391(f) — could bring about the de-designation of the entire New York City Empowerment Zone. We thus reject the argument that either HUD or HHS has sufficient jurisdiction over the East River Plaza project to trigger a Section 106 review of the project.
 
 
 37
 The plaintiffs alternatively argue that even if this Court finds that HUD and HHS lack sufficient jurisdiction over the project to trigger a Section 106 review, we should still deem such a review to be required under the regulations governing HHS block grants. They point out that under 45 C.F.R. § 96.30(a), the states must, "[e]xcept where otherwise required by Federal law or regulation,..obligate and expend block grant funds in accordance with the laws and procedures applicable to the obligation and expenditure of its own funds" (emphasis added), and that when states in turn award at least $300,000 of such moneys to subgrantees, they are required under 45 C.F.R. § 96.31(b)(2) to ensure that the subgrantees are expending the funds in accordance with "applicable laws and regulations." The plaintiffs contend that pursuant to these regulations, NYEZC and UMEZDC — in allocating $5 million in federal funds to the East River Plaza project — must themselves ensure that these moneys are expended in accordance with federal law, and that this obligation necessarily includes subjecting the project to the Section 106 review process.
 
 
 38
 This argument, however, assumes its conclusion: that a Section 106 review of this project is in fact required by federal law (namely, the NHPA). For the reasons set forth above, we have concluded that no federal agency has jurisdiction over the East River Plaza project, and that Section 106 of the NHPA is therefore inapplicable to the project. Therefore, it does not violate federal law for a Section 106 review of this project not to occur. Cf. Lee v. Thornburgh, 877 F.2d at 1057-58 (holding that because Section 106 applies only to federal agencies, it does not apply where Congress has appropriated federal funds directly). Accordingly, we are unpersuaded by the plaintiffs' argument that these regulations somehow independently mandate a Section 106 review in the absence of a federal agency with jurisdiction over the project.
 
 
 39
 Finally, we note that our conclusion that Section 106 is inapplicable here is shared by the ACHP, the agency that is itself charged with overseeing the Section 106 review process. In its letter-brief to this Court, the ACHP concluded that an urban empowerment zone's use of federal block grant funds in connection with individual projects does not trigger the requirements of Section 106, on the grounds that once an empowerment zone has been created and has received federal block grants, there is no federal involvement in the funding decisions for individual projects within the zone. This assessment — an agency opinion letter to which we owe respect under Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944) to the extent that it has the power to persuade, see Christensen v. Harris County, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) — accords with and provides further support for our conclusion.[10]
 
 III.
 
 40
 For the foregoing reasons, we hereby affirm the judgment of the district court granting summary judgment to the defendants.
 
 
 
 Notes:
 
 
 [1]
 United States Department of Housing and Urban Development Secretary Alphonso Jackson is, pursuant to Fed. R.App. P. 43(c)(2), automatically substituted for former Secretary Mel Martinez
 
 
 [2]
 United States Department of Health and Human Services Secretary Michael O. Leavitt is, pursuant to Fed. R.App. P. 43(c)(2), automatically substituted for former Secretary Tommy Thompson
 
 
 [3]
 That estimate has since risen to at least $200 million
 
 
 [4]
 By the time the plaintiffs filed their suit, approximately 65% to 85% of the Factory had already been demolished
 
 
 [5]
 The district court's conversion of the motion into one for summary judgment was done on the basis that all parties had submitted and relied upon extensive materials outside of the Complaint. Neither side has challenged this conversion on appeal and we therefore do not address it here
 
 
 [6]
 In connection with the appeal, this Court requested and received a letter-brief from the Advisory Council on Historic Preservation ("ACHP") — the agency that "issues regulations to implement section 106, provides guidance and advice on the application of the procedures of this part, and generally oversees the operation of the section 106 process," 36 C.F.R. § 800.2(b) — on the issue of whether an urban empowerment zone's use of block grant funds triggers a Section 106 review. We discuss this letter-briefinfra.
 
 
 [7]
 The Ninth Circuit recently held that Section 106 of the NHPA does not give rise to a private right of action and that such challenges must instead be brought pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701et. seq. San Carlos Apache Tribe v. United States, 417 F.3d 1091 (9th Cir.2005).
 
 
 [8]
 For unspecified reasons, although UMEZDC voted in favor of the $15 million loan to the East River Plaza project in October of 2001, and the NYEZC approved that loan one month letter, the loan still had not closed as of March 15, 2004. On that date, therefore, the UMEZDC Board of Directors formally rescinded the commitment to make the loan. Accordingly, at present no Zone funds are officially committed to the project. At oral argument, however, counsel for UMEZDC advised this Court that UMEZDC was likely to re-approve the $15 million loan in question in the very near future, and that the loan may well again be divided equally among federal, state, and city funds, such that $5 million in federal funds will again be slated to the project. This Court thus proceeds to address this issue on the merits
 
 
 [9]
 As of August 2003, approximately $57 million was estimated to remain in this draw-down account
 
 
 [10]
 In this letter-brief, the ACHP thus expressly rejected the conclusory statement contained in an earlier letter by an ACHP director to one of the plaintiffs that "the Empowerment Zone Program administered by [HUD] is subject to review under Section 106 since the use of Federal funds facilitates redevelopment activities." We share the ACHP's conclusion that this earlier letter lacked a sufficient level of explanation or analysis to warrant deference