CONCERNED CITIZENS OF CHAP-
PAQUA, Charles Napoli, and
Gina GORE, Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION (Federal Highway Administration), and the New
York State Department of Transportation, Defendants.

No. 08 Civ. 7325(SCR).

United States District Court,
S.D. New York.

Sept. 12, 2008.

Delight Dorothea Balducci, James Joseph Periconi, Periconi, LLC, New York, NY, for Plaintiffs.

Jean–David Barnea, U.S. Attorney's Office, Janice Barbara Taylor, New York State Dept. of Law, New York, NY, for Defendants.

## ORDER DENYING MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

STEPHEN C. ROBINSON, District Judge.

### I. INTRODUCTION

Plaintiffs Concerned Citizens of Chappaqua, Charles Napoli, and Gina Gore (collectively, "the Citizens") seek a temporary restraining order and a preliminary injunction to prevent the defendants from felling any trees during a planned demolition and reconstruction of the historic Route 120 bridge in the Hamlet of Chappaqua, New York. The Citizens allege that defendants failed to comply with various statutory and regulatory procedures in approving the bridge construction project. For the reasons set forth in this Order, the Citizens' requests for a temporary restraining order and a preliminary injunction are denied.

### II. FACTUAL BACKGROUND

Given the scope of the administrative record in this case—the quality and adequacy of which this Court is required to assess—it is necessary to briefly summarize the relevant facts.[1] The bridge at Route 120 (a.k.a. Quaker Street), spanning the Metro–North Railroad and the Saw Mill River Parkway, was constructed in 1930. In 1994, the bridge was designated as "eligible" to be listed in the National Register of Historic Places, a designation confirmed by the New York State Historic Preservation Office (SHPO) in 2005.[2]

In 1994, defendant New York State Department of Transportation (NYSDOT) identified several structural flaws in the bridge attributable to deterioration and wear over time. FAR 6:5; SAR 706. Further deterioration was noted in subsequent inspections by NYSDOT in 1996 and 1999. *Id.* Another inspection in 2004 revealed even more structural problems, and NYSDOT placed the bridge "on top of the list of the most structurally deficient buildings in NYSDOT's Region 8 (which encompasses the Lower Hudson Valley)." Fed-

---

1. All citations to the Federal Administrative Record are cited as "FAR ___:___," where the first number indicates the document number in the record index, and the second number indicates the page number within the relevant document. The State Administrative Record, numbered sequentially, is cited as "SAR ___."

2. That designation brought the bridge within the protective ambit of two federal statutes implicated in this case: Section 106 of National Historic Preservation Act, 16 U.S.C. § 470f, and Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303(c). As discussed in greater detail below, both statutes require federal agencies to take procedural precautions against jeopardizing or injuring historic "eligible" properties.

eral Highway Administration Opp. Mem. at 3–4; SAR 100–01. The structural problems identified by NYSDOT included cracks, leaks, rusting, and significant loss of structural steel. At that time, NYSDOT concluded that the bridge required immediate attention and began planning to repair or replace the bridge. FAR 6:2.[3]

NYSDOT evaluated three general proposals for the bridge: (1) take no action, (2) repair and rehabilitate the bridge, and (3) replace the bridge. Proposals for the new or repaired bridge included an additional, third lane to accommodate two-way traffic during construction and to ease traffic congestion after completion. FAR 6:7. Consequently, the bridge design project required NYSDOT to replace and expand the bridge's retaining wall on its southeast side to support the bridge's third lane. In 2005, the retaining wall was projected to extend 25 feet. FAR 6:3. NYSDOT first expanded this projection to 144 feet in 2006 and eventually to 298 feet in 2007 due to subsequent design modifications discussed below (FAR 24:48, 114; FAR 33:1).[4]

On December 2, 2005, NYSDOT issued a "Finding Documentation" that identified three historic structures potentially affected by the removal and replacement of the bridge—the Route 120 bridge itself and the nearby Chappaqua Train Station and Depot Plaza. FAR 6:3–4. Unsurprisingly, the report confirmed that the bridge would be adversely affected by the proposed plan to remove and replace it; yet, the NYSDOT determined that the train station and depot plaza would not be affected by the construction. The report included specific mitigation measures to minimize the harm to the historic properties, and concluded that replacement of the bridge was the "preferred alternative." FAR 6:7. After reviewing the report and visiting the bridge site on two occasions, an FHWA official concurred with the report's findings and preliminarily concluded that there were no prudent and feasible alternatives to replacing the bridge. FAR 9:1; FAR 12. As required by Section 106 of the National Historic Preservation Act, FHWA notified the Advisory Council on Historic Preservation of its position on January 9, 2006, and invited the Council to actively participate in consultation, which the Council declined to do. FAR 10; FAR 11.

Thereafter, NYSDOT, FHWA, and the New York State Historic Preservation Office negotiated and executed a Memorandum of Agreement in September 2006. With the input from SHPO, the Memorandum of Agreement concluded that retaining the bridge was not a "reasonable alternat[iv]e" and outlined appropriate mitigation measures to preserve the historic property. FAR 16:2–5. FHWA

---

3. NYSDOT is primarily responsible for design and implementation of the bridge replacement project. Because the state is using federal transportation funds to partially finance the project (FAR 6:2), the Federal Highway Administration (FHWA) must ensure compliance with all applicable federal statutes and regulations. FHWA does not have oversight of this project, and NYSDOT "assume[s] the approval authority for design, plans, specifications, estimates, contract awards and inspections." FAR 32:4–5. Therefore, under the "Oversight Agreement" between NYSDOT and FHWA, NYSDOT will prepare documents required by federal law, and provide such documents to FHWA for review and approval. FAR 32:4.

4. The Court notes some discrepancy in the proposed length of the retaining wall. See Tr. at 14, 28, 44, 45 (variously discussing lengths of 292 and 298 feet). While not resolving this discrepancy, for the limited purposes of this Opinion, the Court adopts the total of 298 feet derived from the Administrative Record and the admission of the defendants. See FHWA Opp. Mem. at 6.

submitted the Memorandum of Agreement, along with evidence of completed mitigation measures, to the Advisory Council on Historic Preservation on July 24, 2008. FAR 27. The Council responded on July 30, 2008, that the submission "completes the requirements of Section 106 of the National Historic Preservation Act and the ACHP's regulations." FAR 28.

In October 2006, NYSDOT issued a 148–page "Final Design Report" concluding that the bridge should be replaced rather than repaired. *See* FAR 18. The agency's conclusion was based on the deteriorated condition of the bridge, the desire to maintain traffic flow during construction, the likelihood of preserving the "historic character" of the bridge, and the relative cost of each alternative. NYSDOT also concluded that there were "no feasible and prudent alternatives to the use of the historic bridge." FAR 18:66.

Finally, NYSDOT examined the necessity of performing an environmental impact statement or assessment, and found that the project would not significantly impact the nearby environmental or ecological resources. *See* FAR 18:56–62. The Final Design Report acknowledged the project's impact on historical sites, but concluded that the measures articulated in the Memorandum of Agreement between NYSDOT, FHWA, and SHPO were sufficient to mitigate the adverse impact. With respect to trees, the Final Design Report found that the environmental and visual effects of any tree removal "will be mitigated by final landscaping, re-vegetation and tree planting activities." FAR 18:49, 60. Upon these findings, NYSDOT concluded that

the bridge project qualifies as a "Class II" "categorical exclusion" under regulations of the National Environmental Protection Act, 23 C.F.R. § 771.117(a) and (d). FAR 18:53.

On July 11, 2007, the Town of New Castle (which contains the Hamlet of Chappaqua) sent a letter requesting that NYSDOT expand the bridge project to include construction of a nearby intersection to ease congestion. *See* FAR 23:1–2. In October 2007, the NYSDOT redesigned the project for this purpose, and prepared a modified construction plan. FAR 24. The modified construction plan expanded the retaining wall on the southeast side of the bridge to 298 feet to support a new right-turn lane. FAR 24:48, 114; FAR 33:1.

NYSDOT determined that the proposed changes to the bridge project "did not affect the agency's earlier findings with respect to the [three federal laws at issue in this case]." FAR 23:2. It is undisputed that the defendant agencies did not return to SHPO for a re-consultation following the expansion of the retaining wall to 298 feet.

Returning finally to the gravamen of this motion, the proposed construction, including site preparation, would require the felling of roughly 61 large trees near the bridge. This total includes four to fifteen additional trees threatened by the proposed expansion of the retaining wall to 298 feet.[5] According to representations from both parties, the trees are scheduled to be cut down in preparation for construction beginning September 15, 2008.

---

5. At oral argument, the Citizens proffered that "about a dozen or 15 or more" trees will be felled as a result of the retaining wall expansion from 25 feet to 298 feet. Tr. at 45. In contrast, the defendants claimed that the ex-

pansion of the wall from 144 feet to 298 feet would "impact four or five additional trees that wouldn't have already been impacted by the project as earlier planned." Tr. at 30.

## III. *ANALYSIS*

### A. Standard for a Preliminary Injunction and TRO

 The Citizens seek a temporary restraining order and a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure. "A district court may enter a preliminary injunction staying government action taken in the public interest pursuant to a statutory or regulatory scheme only when the moving party has demonstrated that he will suffer irreparable injury, and there is a likelihood that he will succeed on the merits of his claim." *Alleyne v. New York State Educ. Dep't,* 516 F.3d 96, 101 (2d Cir.2008) (internal quotations and citations omitted). Because the government's action is presumed to be in the public's interest, the Citizens must meet the more rigorous likelihood-of-success standard. *Beal v. Stern,* 184 F.3d 117, 122 (2d Cir.1999). The injury must be "actual and imminent" and not capable of remedy by monetary damages. *Rodriguez v. DeBuono,* 175 F.3d 227, 234 (2d Cir.1999) (per curiam). Finally, when the preliminary injunction implicates public interests, a court should consider the balance of such public interests when evaluating the private injury. *Brody v. Village of Port Chester,* 261 F.3d 288, 290 (2d Cir.2001).

The same standard applies to the Citizens' application for a temporary restraining order. *See, e.g., Andino v. Fischer,* 555 F.Supp.2d 418, 419 (S.D.N.Y.2008) ("It is well established that in this Circuit the standard for an entry of a TRO is the same as for a preliminary injunction."); *Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd.,* 190 F.Supp.2d 577, 580 (S.D.N.Y.2002) ("The standard for granting a temporary restraining order and a preliminary injunction pursuant to Rule 65 of the Federal Rules of Procedure are identical.").

### B. Application of Law

#### 1. The Destruction of 61 Trees Constitutes Irreparable Harm

The Citizens allege, and the defendants do not contest, that approximately 61 trees will be cut down during preparation and execution of the bridge construction project. Some of the jeopardized trees are described as "irreplaceable" and "specimen" trees due to their age, beauty, location, or species. Barlett Aff. ¶¶ 3–4 (Aug. 18, 2008). As explained above, the trees are scheduled to be cut down as early as September 15, 2008.

 The Court agrees that the imminent felling of 61 trees constitutes irreparable harm. The United States Supreme Court has recognized that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable." *Amoco Prod. Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). Specifically, the felling of trees has been held to constitute an irreparable environmental injury sufficient to warrant a preliminary injunction. *See New York v. Shinnecock Indian Nation,* 523 F.Supp.2d 185, 301 (E.D.N.Y.2007) (finding irreparable harm where "anticipated construction . . . will have a detrimental environmental impact, some of which is essentially irreversible, such as the destruction of trees"). Consequently, the Court finds evidence of imminent and irreparable injury sufficient to satisfy the first prong in support of a preliminary injunction.

#### 2. Likelihood of Success on the Merits

The second hurdle faced by the Citizens is a high one. Under the Administrative Procedures Act, 5 U.S.C. § 706(2)(A), a

reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance of law." 5 U.S.C. § 706(2)(A); *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 375–76, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). This standard of review has been described as "exceedingly deferential." *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir.1996); *accord Environmental Def. v. United States E.P.A.*, 369 F.3d 193, 201 (2d Cir. 2004) ("particularly deferential"). This Court does not sit in *de novo* review of the substantive decision made by the defendant agencies; rather, the Court's limited role in reviewing the adequacy of that decision is much narrower. Under the "arbitrary and capricious" standard, agency action is upheld if the agency "has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983); *see also Sierra Club v. United States Army Corps of Eng'rs*, 772 F.2d 1043, 1051 (2d Cir.1985) (finding agency action arbitrary or capricious only where the agency "relies on factors Congress did not want considered, or utterly fails to analyze an important aspect of the problem, or offers an explanation contrary to the evidence before it, or its explanation . . . is so implausible that it cannot be ascribed to differing views or agency expertise").

In their amended complaint,[6] the Citizens assert five claims, divisible into three federal laws and attendant regulations: Section 106 of the National Historic Preservation Act of 1966 (NHPA), 16 U.S.C. § 470f, the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 *et seq.*, and Section 4(f) of the Department of Transportation Act of 1966 ("Section 4(f)"), 49 U.S.C. § 303(c). The Citizens only need to demonstrate a likelihood of success on the merits of one claim to warrant injunctive relief. *Payment Alliance Int'l, Inc. v. Ferreira*, 530 F.Supp.2d 477, 483 (S.D.N.Y.2007). The merits of each claim are considered in turn.

### a. The National Environmental Policy Act

Before expenditure of federal funds, NEPA requires a federal agency to assess the environmental impact (which includes impact on historical and ecological resources) of every "major federal action"[7] unless the project falls under a regulatory "categorical exclusion." 42 U.S.C. § 4332(C); 23 C.F.R. § 771.115; *Fund for Animals v. Babbitt*, 89 F.3d 128, 130 (2d Cir.1996). The mandate of NEPA "is essentially procedural." *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). "The role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary

---

6. The Citizens filed an Amended Complaint on September 9, 2008, after the close of briefing on this Motion. Consequently, this Court is not required to consider the additional claim for relief under Section 106 of the NHPA not present in the original complaint. Nevertheless, the Court finds that the defendants fully and adequately briefed the issues regarding compliance with Section 106, and therefore finds that the defendants were not

prejudiced by plaintiffs' eleventh-hour amendment.

7. "The phrase 'Federal action' also includes those projects undertaken or performed essentially by the states but funded in whole or in part by the federal government." *Citizen Advocates for Responsible Expansion, Inc. v. Dole*, 770 F.2d 423, 431 n. 9 (5th Cir.1985).

or capricious." *Baltimore Gas & Elec.*, 462 U.S. at 97–98, 103 S.Ct. 2246.

■ Under regulations promulgated pursuant to the NEPA, "categorical exclusions" are generally defined as "actions which ... do not have a significant impact on any natural, cultural, recreational, historic or other resource ... or do not otherwise, either individually or cumulatively, have any significant environmental impacts." 23 C.F.R. § 771.117(a); 40 C.F.R. § 1508.4. An agency's decision to categorically exclude a proposed project from environmental review "is entitled to substantial deference." *City of New York v. I.C.C.*, 4 F.3d 181, 186 (2d Cir.1993). Certain agency projects—including highway modernization and bridge replacement—may be categorically excluded, upon agency approval, if they meet the criteria from subsection 117(a). 23 C.F.R. § 771.117(d)(1), (3).

The Citizens contend that the bridge project was improperly designated as a "categorical exclusion." Amended Complaint ¶¶ 75–89. The Citizens argue that the bridge's historic designation prevents the project from "categorical exclusion" classification, presumably due to an alleged failure to satisfy the criteria of 23 C.F.R. § 771.117(a). However, the fact that the bridge is an historic-eligible property does not necessarily disqualify its classification as a "categorical exclusion." *See Friends of Pioneer Street Bridge Corp. v. Federal Highway Admin.*, 150 F.Supp.2d 637, 653 (D.Vt.2001) ("a mere finding of 'adverse effect' on a 4(f) [historic-eligible] property (especially where, as here, the agency has provided for mitigation of that adverse effect) is insufficient to support the conclusion that the project will 'significantly impact' a 4(f) property.").

■ The Citizens have not demonstrated a likelihood of prevailing on this claim. Taken as a whole, the administrative record includes a sufficient basis for the

Court to find that the agencies were not arbitrary or capricious in concluding that "the bridge replacement project meets the conditions and criteria of a categorical exclusion since it will not induce significant environmental impacts." SAR 822, 751–61; FAR 18:52–62 (detailing the social, economic, and environmental considerations and findings). The Final Design Report assesses the project's impact on surface waters and wetlands, water sources, general ecology and wildlife, historical and cultural resources, visual resources, parks, farmland, air, nose, energy, and contaminated materials. *Id.* Given this broad environmental assessment, the Court cannot conclude that the "categorical exclusion" classification was clearly erroneous.

### b. The National Historic Preservation Act

Section 106 of the NHPA requires federal agencies, prior to the expenditure of federal funds, to "take into account the effect of [any] undertaking" on a structure eligible for historic preservation. 16 U.S.C. § 470f. An adverse effect exists when "an undertaking may alter, directly or indirectly, any of the characteristics of a historic property ... in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." 36 C.F.R. § 800.5(a)(1). When an adverse effect is identified, the agency must notify the Advisory Council on Historic Preservation in order that it may "comment with regard to such undertaking." 16 U.S.C. § 470f. Similarly, the agency must further consult with the appropriate state historic preservation office to evaluate alternatives or modifications to "avoid, minimize, or mitigate adverse effects on historic properties." 36 C.F.R. § 800.6(a). Section 106 does not grant any substan-

tive rights; rather, the section has been described as a "stop, look, and listen provision" that does not require any particular outcome. *Business & Residents Alliance of East Harlem v. Jackson*, 430 F.3d 584, 591 (2d Cir.2005) (internal quotations omitted).

As described above, FHWA reviewed NYSDOT's analysis and invited the Advisory Council on Historic Preservation to consult on the bridge project. Thereafter, the defendants executed a Memorandum of Agreement with SHPO that, in the Court's view, fully satisfied the procedural requirements of Section 106 and 36 C.F.R. § 800.6. The Memorandum of Agreement acknowledges consultation between necessary agencies, identifies the affected historic property, and specifies precise mitigation measures—specifically, a full documentary and photographic preservation of the property to be sent to the State Archives. FAR 16:2. "A memorandum of agreement executed and implemented pursuant to [Section 800.6] evidences the agency official's compliance with Section 106...." 36 C.F.R. § 800.6(c). Consequently, the Citizens have failed to demonstrate a likelihood of success on the merits of their claim that the defendants "acted arbitrarily and capriciously in undertaking the initial NHPA Section 106 review." Amended Complaint ¶ 110.

But the Citizens' more colorable claim is this: after the expansion of the retaining wall to 298 feet, the defendants failed to provide SHPO with the revised project designs for a fresh evaluation under Section 106. Amended Complaint ¶¶ 111–13. Regulations promulgated under the NHPA provide that if "unanticipated effects on historic properties [are] found after the agency official has completed the section 106 process ... the agency official shall make reasonable efforts to avoid, minimize or mitigate adverse effects to such properties and * * * if construction on an approved undertaking has not commenced, consult [with SHPO] to resolve adverse effects pursuant to [36 C.F.R.] § 800.6." 36 C.F.R. § 800.13(b)(1). It is undisputed that the defendants did not conduct a second, formal Section 106 evaluation after plans for the retaining wall expanded to 298 feet.

The only question, then, is whether the defendants were required by law to conduct the second evaluation. The question is a close one. While the Citizens portray the expansion of the retaining wall as a "significant change" (Pl. Mem. at 15–16), the FHWA, predictably, describes the expansion of the retaining wall as a "minor modification" (FHWA Opp. Mem. at 2). The Citizens claim that the expanded wall constitutes an "unanticipated effect[ ] on historic properties" under 36 C.F.R. § 800.13(b)(1), because of the wall's visual impact on the bridge, the train station, and the depot plaza.[8] "Visual effects" can constitute adverse effects on historic property. 36 C.F.R. § 800.5(a)(2)(v) ("Adverse effects on historic properties include * * * [i]ntroduction of *visual,* atmospheric or audible elements that diminish the integrity of the property's significant historic features.") (emphasis added). However, under 36 C.F.R. § 800.5, the "visual element" must "diminish the integrity of the property's significant *historic features.*" *Id.* (emphasis added); *see also* 36 C.F.R.

---

**8.** *See* Tr. at 14 (Plaintiffs' counsel emphasized that the retaining wall is "view[ed] from the south. And that's important. That's important because from the south is where you stand in depot plaza. And from the south is where you would be in front of the Chappa-

qua train station. So these historic resources I think it's intuitive [—] you don't have to be an historic preservation expert to know that at least you should evaluate whether this monstrous retaining wall [affects the property].").

§ 800.16(i) ("Effect means alteration to the *characteristics of a historic property* qualifying it for inclusion in or eligibility for the National Register.") (emphasis added).

■ There is insufficient evidence for the Court to find the defendants' decision not to reevaluate the project under 36 C.F.R. § 800.13(b)(1) was arbitrary or capricious. It is not clear at this time that the retaining wall's visual impact might adversely effect "the features" or "the characteristics of a historic property qualifying it" for historical protection. 36 C.F.R. §§ 800.5(a)(2)(v), 800.16(i). The Citizens have failed to show that the features of the Train Station and Depot Plaza qualifying each as historic properties would be "effected" by the visual impact of the expanded retaining wall. Moreover, the Court finds persuasive the conclusions of Kenneth Markunis, the Historic Sites Restoration Coordinator of SHPO. In an affidavit dated September 9, 2008, Mr. Markunis states:

> The SHPO has reviewed project plans for this project, including both those that existed at the time of the findings documentation, as well as the more detailed plans dated October 2007, which reflect the 298–foot retaining wall. Nothing about those detail design plans alters the SHPO's determination that the adverse effect of the project on the

bridge itself is minimized and mitigated.... For purposes of SHPO's review and the [Memorandum of Agreement], the retaining wall is separate and distinct from the Route 120 Bridge historic resource and it is not material to SHPO's evaluation of the effects on that historic resource. With respect to the Railroad Depot and the Depot Plaza, ... the details of the bridge design plans— including the 298–foot retaining wall, tree removal, and any other work reflected on the October 2007 plans—will have no adverse impact, nor will it have any additional adverse impact to the complete replacement of the bridge.

Markunis Aff. ¶¶ 8–9 (Sept. 9, 2008).[9] Thus, the Court finds the Citizens have not met the substantial burden of showing a likelihood of success on the merits of this claim. *See Southern Utah Wilderness Alliance v. Norton,* 326 F.Supp.2d 102, 115–16 (D.D.C.2004) (finding that agency had no duty to re-open NHPA consultation under section 800.13(b) where the Advisory Council on Historic Preservation and the SHPO previously approved the project and had not made subsequent findings of adverse effects).

### c. Section 4(f) of the Department of Transportation Act

■ Section 4(f) permits the Federal Highway Administration to "use" the "land

---

9. At oral argument, the Citizens moved to strike the affidavit of Kenneth Markunis, dated September 9, 2008 ("Markunis Aff."). on the grounds that it was not included in the official administrative record. Tr. at 48. However, the affidavit's exclusion from the administrative record does not necessarily preclude its consideration when evaluating the merits of this case. Because the record does not show that SHPO considered the effects of the redeveloped bridge design—indeed that absence constitutes the factual basis for one of the Citizen's claims—it is appropriate for the Court to consider this evidence. *National Audubon Soc'y v. Hoffman,* 132 F.3d 7, 14 (2d Cir.1997) (supplemental testimony

may be required "when the reviewing court simply cannot evaluate the challenged action on the basis of the record before it"); *Preservation Coalition of Erie County v. Federal Transit Admin.,* 129 F.Supp.2d 551, 562–63 (W.D.N.Y.2000) ("A district court need not, and should not develop a record ab initio, but should rely on the agency record, where that is feasible. However, the court can supplement the record with testimony on new matters when 'the agency's record is so sparse as to make judicial review ineffectual.' ") (quoting *Sierra Club v. U.S. Army Corps of Eng'rs,* 772 F.2d 1043, 1052 (2d Cir.1985)). Consequently, the Citizens' oral motion to strike the Markunis Affidavit is denied.

of an historic site" only if there is no "prudent and feasible alternative to using that land" and the project "includes all possible planning to minimize harm" to the historic site resulting from the use. 49 U.S.C. § 303(c). Unlike the two statutes previously considered, Section 4(f) "imposes a substantive mandate" to avoid unnecessary use of and minimize harm to historic property. *City of Alexandria, Virginia v. Slater*, 198 F.3d 862, 871 (D.C.Cir.1999); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 411, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

██ The Citizens' claims under the Department of Transportation Act relate only to the prudence and feasibility prong under section 4(f)(1). *See* Amended Complaint ¶¶ 90–102. Under Section 4(f)(1), "feasible" means capable of development through sound engineering, and "prudent" involves "a common sense balancing of practical concerns." *Overton Park*, 401 U.S. at 411, 91 S.Ct. 814; *Assn's Working for Aurora's Residential Env't v. Colorado Dep't of Transp.*, 153 F.3d 1122, 1131 (10th Cir.1998). An agency may reject feasible alternatives as imprudent based on a wide variety of factors, including cost, traffic considerations, safety, traveler convenience, and failure to meet project objectives. *Monroe County Conservation*

*Council, Inc. v. Adams*, 566 F.2d 419, 423–25 (2d Cir.1977).

██ In accord with federal guidelines, *see* "Historic Bridges; Programmatic Section 4(f) Evaluation and Approval," 48 Fed. Reg. 38,135–03 (Aug. 22, 1983), the NYSDOT considered three design alternatives for the bridge project: (1) "no action"/maintenance, (2) bridge rehabilitation, and (3) bridge replacement (which included four "maintenance and protection of traffic" sub-alternatives). *See* FAR 18:34–51 (and exhibits), 63–66. The Court finds that the Administrative Record contains sufficient consideration of permissible factors in evaluating design alternatives. The "no action"/maintenance alternative was rejected as infeasible because it fails to correct structural deficiencies, rendering the bridge structurally unsound for use. Bridge rehabilitation was also considered infeasible for failure to "meet all of the project objectives." [10] While not clearly articulated in the Final Design Report, it is reasonable to conclude that rehabilitation fails to meet the following objectives: provide a safe, non-deficient structural condition for more than 30 years [11] and minimize maintenance and repair. [12] The Citizens do not challenge the other, alternative, replacement design proposals under Section 4(f).

10. The Court is not convinced that rehabilitation is "infeasible" within the narrow meaning of that term. *See Overton Park*, 401 U.S. at 411, 91 S.Ct. 814. However, the agency could find that rehabilitation is "imprudent" for failing to meet certain project objectives. *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 203 (D.C.Cir.1991) ("case law uniformly holds that an alternative is imprudent under section 4(f)(1) if it does not meet the *transportation* needs of a project") (emphasis in original); *City of Bridgeton v. F.A.A.*, 212 F.3d 448, 461 (8th Cir.2000) ("an alternative that does not effectuate the project's purposes is, by definition, unreasonable, and need not be evaluated in detail under § 4(f)") (internal quotations omitted). As section 4(f)(1) requires alternatives to be both feasible *and* prudent, the particular designation does not change the outcome.

11. *See* FAR 18:37 (projecting that the rehabilitation option would "extend the service life of the structure for at least another twenty years with only minor maintenance requirements").

12. *See* FAR 18:37, 39 (detailing necessary repair and maintenance measures).

Therefore, the Court finds sufficient evidence in the Administrative Record that the defendants adequately considered the relevant factors under Section 4(f), and that the agencies' evaluation of "feasible and prudent alternatives" was reasonable.

## IV. CONCLUSION

This Court cannot, and should not, use its power of review "as a vehicle to impose [its] own judgment" to displace the considered opinion of the defendants. *City of Alexandria*, 198 F.3d at 874 (citing *Vermont Yankee*, 435 U.S. at 554, 98 S.Ct. 1197). As another court aptly declared, "Our obligation is not to further our *beau ideal* of a bridge design, but merely to ensure that the procedures mandated by these statutes have been complied with." *Id.* Having failed to clearly establish a likelihood of success on the merits, the Citizens' application for a temporary restraining order and their motion for a preliminary injunction are denied.

*It is so ordered.*